MAXSON *v*. MICHIGAN CENTRAL RAILROAD CO.

1. CONTRACTS BY AGENT — SUBSEQUENT DECLARATIONS — ADMISSIBILITY.

The representations or declarations of an agent with respect to a contract alleged to have been made by him three years before are inadmissible to bind the principal.

2. SAME — RAILROAD COMPANIES — DIVISION SUPERINTENDENT — IMPLIED AUTHORITY — AGREEMENT FOR LIFE EMPLOYMENT.

A division superintendent of a railroad has no implied authority to bind th e company by an agreement to give life employment to an employé of the company in settlement of a claim for personal injuries.

3. SAME — RATIFICATION — EVIDENCE.

That an injured railroad employé is subsequently hired by the company's agent to perform services which he is capable of rendering is not evidence to show a ratification by the company of an alleged contract by such agent to continue him permanently in its employ.[1]

Error to Wayne; Frazer, J. Submitted April 7, 1898. Decided May 24, 1898.

---

[1] Contracts for permanent employment and similar agreements is the subject of a note to *Carnig* v. *Carr*, (Mass.) 35 L. R. A. 512.

*Assumpsit* by Daniel C. Maxson against the Michigan Central Railroad Company for the breach of an alleged contract to continue plaintiff permanently in its employ. From a judgment for plaintiff, defendant brings error. Reversed.

In 1887 plaintiff was in the employ of the defendant in its yards at Jackson, Mich., and while coupling cars lost his arm. He was employed by one J. D. Clark, an assistant train-master. After recovering from the accident, he was re-employed by the defendant, at first tending switches, and subsequently tending the gates. He continued in this employment until April 16, 1894, when he was discharged on the ground of inattention to his duty. He then brought this suit, based upon a parol contract with the defendant, by which it is claimed the defendant agreed that, if he would refrain from prosecuting it for any claim for damages on account of the injury, it would furnish him a job during the period of his natural life, as long as he did his work well, at such wages as were paid to others in this same employ. It is claimed that the contract was made with one Charles B. Bush, the division superintendent at Jackson, who died before this suit was brought. Following is the testimony on which the contract is based:

One George C. Stearns testified that he was at plaintiff's house soon after the accident, and heard a conversation between plaintiff and Bush, which he states as follows:

"*Q*. You may state the conversation that was had between Maxson and Bush in your presence on that occasion.

"*A*. Mr. Bush said that he ought to have a permanent job with the company. In the whole conversation Mr. Maxson spoke of the promise that Kassner had made, and told him that Mr. Kassner had promised him a permanent position on the road if he would waive all rights to recover, or words to that effect; and Mr. Bush said that he ought to have a situation with the company.

"*Q*. When did he say that he should have it?

"*A*. As soon as he was able to work and perform his duties.

"*Q.* What was said about Mr. Maxson waiving any claim for damages?

"*A.* Mr. Bush said, if he would waive his claim, and not bring any suit against the company, they would give him a permanent job."

On cross-examination he testified as follows:

"*Q.* Tell us exactly what that conversation was again.

"*A.* They mentioned what Mr. Kassner had told him—

"*Q.* Who said that?

"*A.* I think Maxson.

"*Q.* What did Maxson say to Bush?

"*A.* He said that Mr. Kassner had made him a promise of a permanent job.

"*Q.* Did he say anything else?

"*A.* Yes, he said he made a promise of permanent job if he would not sue the company; that is, if he would accept work, and not commence any lawsuit.

"*Q.* Just what did he say about the lawsuit part of it? Give us his words.

"*A.* That is what Mr. Maxson's words were, that Mr. Kassner had made him that promise.

"*Q.* Had made him a promise for what?

"*A.* If he would waive his rights.

"*Q.* If he would waive his rights against the railroad company,—is that it?

"*A.* Yes, sir.

"*Q.* Is that the language that he used?

"*A.* Words to that effect,—if he would not commence any suit, that they would hire him, and take care of him, and give him a permanent job.      •

"*Q.* He said if he would not commence suit they would give him a permanent job?

"*A.* If he would not commence a suit; yes, sir.

"*Q.* What did Mr. Bush say to that?

"*A.* Mr. Bush said he should have work with him,—he said he should have a permanent job.

"*Q.* What did he say,—'All right,' or what?

"*A.* He said, 'All right,' he should have a permanent job.

"*Q.* Mr. Bush nodded his head, and said, 'All right,'— is that right?

"*A.* Yes, he said he should have a permanent job.

"*Q.* Did anything else take place on that subject beyond what you have stated?

"*A.* No, sir; nothing beyond what I have stated."

Mrs. Maxson, the wife of plaintiff, testified as follows:

"Mr. Bush came into the room, and was there quite a long time. When he got up to go away, something was said about what we were going to do. I spoke up, and said that I didn't know what we were going to do. He says: 'It does not make any difference. Just as soon as Mr. Maxson is able to go to work, we will give him a permanent job,—a life job.' I took from that a permanent job. He said just as soon as he was able to go to work.

"Q. What, if anything, was said about commencing suit?

"A. He said, of course he should commence no suit; if he should waive the examination, and not commence a suit against the company, he would give him a job. He said he would get the same pay as other men did at whatever work they set him at."

On cross-examination she testified:

"When Mr. Bush started to go, I spoke up, and said I didn't know what we were going to do, and he said, 'Mr. Maxson will have work as soon as he is able to work, and we will give him a permanent job.'

"Q. That was the language which he used?

"A. That was the language,—similar to that.

"Q. That as soon as Mr. Maxson was able to work he would give him a permanent job,—is that what he said?

"A. It may not be exactly like that, word for word.

"Q. But substantially that?

"A. I think that is what it amounted to.

"Q. What else?

"A. He said he would waive examination,—waive all rights to the company. He says, 'If Mr. Maxson will waive all rights to the company, we will give him a permanent job,—if he won't sue the company.'

"Q. Did he use the term, 'waive rights?'

"A. I do not know whether he did, but it was similar to that,—if he would not bring suit.

"Q. Didn't you get the expression 'waive rights' from talking with your attorney?

"A. No, sir.

"Q. Did Mr. Bush use the words 'waive rights against the company?'

"A. I don't know whether he did.

"*Q.* Then you cannot tell exactly what he said about this question of his claim against the company?

"*A.* He said if he would make the company no trouble, —would not sue the company,—he would give him a permanent job.

"*Q.* If he would not sue the company, or make the company any trouble?

"*A.* Something of that kind.

"*Q.* That was all that was said by him?

"*A.* I think it was. I don't remember anything else."

One Alfred S. Wells testified, under objection and exception, to the following conversation with Mr. Bush in 1890:

"I was night yard-master at Jackson at the time I had this conversation with Mr. Bush. I reported Mr. Maxson to Mr. Bush for failing to handle the switch as I thought he ought to, and Mr. Bush told me it was strange that I could not get along with Maxson. He says: 'I think if you will do what is right with Maxson, Maxson will do what is right with you. In any event, we have given Mr. Maxson a permanent position while he lives.' I felt a little chagrined over that, and I said, 'Do I understand you have given him a life job?' and he said, 'Yes.'"

Plaintiff recovered verdict and judgment.

Three errors are assigned:

(1) In admitting the testimony of the witness Wells.

(2) In submitting to the jury the question whether Bush had the authority to make the contract.

(3) That there was no evidence tending to show that there was a valid contract.

*Russel & Campbell,* for appellant.

*Lehman Bros.* (*Navin & Sheehan,* of counsel), for appellee.

GRANT, C. J. (*after stating the facts*). 1. It was error to admit the testimony of the witness Wells. Contracts cannot be established by statements of an agent made years afterwards. Such statements do not bind the principal. If Bush had been living, and a witness for the de-

fendant, this testimony, upon laying the proper foundation, would have been admissible as impeaching. "The admission or declaration of an agent binds his principal only when it is made during the continuance of the agency, in regard to a transaction then depending *et dum fervet opus.* It is because it is a verbal act, and part of the *res gestæ*, that it is admissible at all." 1 Greenl. Ev. § 113. "The representation, declaration, or admission of the agent does not bind the principal if it is not made at the very time of the contract." Story, Ag. § 135; *Haven* v. *Brown*, 7 Me. 421 (22 Am. Dec. 208); 1 Am. & Eng. Enc. Law (2d Ed.), 1143.

2. This was an unusual contract, and not such as individuals or corporations are in the habit of making. A division superintendent of a railroad is not a general agent who is, by virtue of his agency, authorized to perform every act, or make every contract, which his principal might do. To settle claims and make life contracts is not within the ordinary power of such an agent. It was, therefore, incumbent upon the plaintiff to show either original authority to make the contract or ratification by the company. Plaintiff showed no original authority in Bush either to settle a claim for damages or to employ the plaintiff for life. Certainly a division superintendent, who is subject to the supervision of the general superintendent, and of the president and directors of the company, is not clothed, by virtue of his agency, with any greater authority than is the cashier of a bank or other corporation. In *Delta Lumber Co.* v. *Williams*, 73 Mich. 86, it was held that "compromising claims, settling unliquidated damages, and releasing debts due to the corporation, are acts which do not come within the ordinary duties of a cashier." In making such an extraordinary contract, plaintiff knew that he was dealing with a subordinate agent of the company, and was bound to inquire into and ascertain his authority, not from the agent with whom he dealt, but from the principal with which he was dealing. In *Brighton* v. *Railway Co.*, 103 Mich. 420, plaintiff's claim was based

upon a written contract for the payment of money in settlement of his damages, and for permanent employment. Money could not well have been paid from the treasury of the company without the authority of the company itself. There was, therefore, evidence both of original authority and of ratification, and in a conflict of evidence the question was properly submitted to the jury. In this case there was no money to be paid, and nothing to indicate that the company was informed that plaintiff was employed in any other than the ordinary manner. The evidence on the part of the defendant showed that Bush had no authority to settle claims, or to employ men for life. Plaintiff introduced no evidence to the contrary. It was, therefore, error to submit the question of authority or of ratification to the jury. *Randall* v. *Railway Co.*, 113 Mich. 115 (38 L. R. A. 666); *Hartigan* v. *Railroad Co.*, 113 Mich. 122. If plaintiff relied upon ratification, it was his duty to establish the fact that defendant had knowledge of the alleged contract with Bush, and acted upon it. 1 Am. & Eng. Enc. Law (2d Ed.), 1189. The record is barren of any evidence to prove such knowledge. The mere fact that plaintiff was employed for the company to perform services which he was capable of rendering is not evidence either to sustain the alleged contract or of ratification.

It is unnecessary to discuss the other question raised. Under this record the court should have directed a verdict for the defendant.

Judgment reversed, and new trial ordered.

The other Justices concurred.