### PENNSYLVANIA TAXIMETER CAB CO. v. CRESSEY.

(Circuit Court of Appeals, Third Circuit. November 6, 1911.)

No. 27 (1,523).

CORPORATIONS (§§ 406, 426*)—POWERS OF AGENT—IMPLIED AUTHORITY.

The fact that an assistant secretary of defendant, a taxicab company, acting under authority from the company, employed plaintiff as an insurance broker to place insurance on its cars from time to time as new cars were purchased or existing insurance expired, each transaction being separate, had no tendency to give such assistant secretary implied authority to bind defendant by a contract to give plaintiff all of its insurance business for a term of three years, or any other term, nor was such contract ratified by defendant by accepting policies procured by plaintiff after it was made where the directors had no knowledge of it at the time and repudiated it at once when it became known to them.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1611–1614, 1596, 1702–1704, 1707, 1708, 1710–1716; Dec. Dig. §§ 406, 426.*]

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

Action by Kendall B. Cressey against the Pennsylvania Taximeter Cab Company. Judgment for plaintiff, and defendant brings error. Reversed.

Alexander Simpson, Jr., for plaintiff in error.

Thomas F. Gain (Alfred L. Cameron, on the brief), for defendant in error.

Before GRAY, BUFFINGTON, and LANNING, Circuit Judges.

GRAY, Circuit Judge. The action in the court below was brought by Kendall B. Cressey, the defendant in error (hereinafter called the plaintiff), against the Pennsylvania Taximeter Cab Company, the plaintiff in error (hereinafter called the defendant), to recover upon an alleged contract to employ the plaintiff as the exclusive insurance broker of the defendant for a period of three years. The gist of the case, as set out in the statement of claim, is that the defendant, by George W. Close, its assistant secretary and assistant treasurer, engaged plaintiff in September, 1908, to procure insurance on its vehicles

against loss by fire, burglary, liability and collision; that under that engagement, from then until November 4, 1909, he placed all the insurance on defendant's vehicles, and procured, at the request of the defendant, the adjustment and settlement of all its claims for losses thereunder; that during that period, the plaintiff procured for the defendant, approximately, 71 policies of insurance, aggregating about $463,000, and settled losses aggregating about $4,000; that in the transaction of this business, he received all his orders from and made all his settlements with the said George W. Close, as the agent and representative of the defendant company, "and plaintiff is advised, and therefore avers, that by this course of dealing, the defendant held out to the plaintiff the said George W. Close as its agent and officer, duly authorized to contract for and conduct all its insurance business on all its vehicles."

The plaintiff then avers that subsequently, in November, 1909, he was invited by the defendant, through its agent, George W. Close, to submit a proposal for certain modifications in the form and extent of its insurance upon vehicles and in the rate of premiums to be paid, and in the personnel of the insurers, and that thereupon the plaintiff submitted to the defendant an offer in writing for such modifications. This offer is set out in extenso in the statement of claim and, as afterwards produced in evidence, is as follows:

"Philadelphia, November the Second, 1909.

"Pennsylvania Taximeter Cab Co., 1407 Locust Street, Philadelphia.

"Gentlemen: Regarding the insurance on your entire line of motor cars of every description, I beg to quote you herewith a rate of $160 for liability and passenger hazard, $5,000 and $10,000 limits and collision damage and property liability with limits of $5 to $500 and fire and burglary insurance of 2% of the valuation of the car.

"The fire and burglary insurance will be placed at the expiration of the present policies November 26th, '09, and I will place the collision both ways insurance by endorsement on the present Philadelphia Casualty policies pro rata of $60 per annum until the expiration of the present policies. This to be effective on cars the liability charge for which has been $100 or less, all cars which have been delivered to you for liability at $125 per car are to be adjusted on a basis of $160 per car.

"As per our several conversations this price is of course made possible by reason of the fact that your Company and my office will enter into a contract whereby I guarantee you rates as per this schedule until the expiration of the present policies and for three one year renewals thereafter, and you are to agree that I shall have all the insurance on all your cars for this term at this price.

"I am very happy to be able to offer you this concession.

"Very respectfully, Kendall B. Cressey."

It is averred that subsequently, on November 4, 1909, the defendant, by its agent, Close, held out and authorized as aforesaid, accepted the proposal of the plaintiff in writing, a copy of which acceptance is as follows:

"Philadelphia, Pa., November the Fourth, 1909.

"Mr. Kendall B. Cressey, Agent, 416 Walnut Street, Philadelphia.

"Dear Sir: In reply to yours of the 2nd inst. I beg to state we accept the contract contained therein, with the exception, however, that the $5.00 minimum does not apply.

"Yours very truly, Geo. W. Close, Asst. Treasurer.

"WCW–HH"

The plaintiff then avers that he accepted the modification of his offer, mentioned in his letter of acceptance, waiving the five dollar minimum loss for collision damage, and proceeded to performance under his contract, as thereinafter set forth. The plaintiff further avers that subsequently to November 26, 1909, the date at which most of the former policies on the vehicles expired, he procured for and delivered to the defendant new policies for motor car insurance, renewable each year for three years, aggregating in amount approximately $276,600. Plaintiff therefore avers that, by this course of dealing, subsequent to the date of the written contract as thereinbefore set forth, the defendant had effectually ratified and confirmed the contract aforesaid.

Upon the evidence adduced by the plaintiff in support of these averments, two questions were submitted to the jury by the learned judge of the court below:

"The first question is this: Did Mr. Close have implied authority to make the contract in question? That permits, as you see, of an answer either yes or no. If you answer that question yes, then there is no need to answer the second question. But the second question, if you answer no—that is, that means if the plaintiff had no implied authority to make the contract—then the second question is: Did the defendant ratify the contract in question? You can answer that either yes or no. If you answer both these questions no, then your verdict must be for the defendant."

There were a number of exceptions to refusals to charge requests made by the defendant, but it will be unnecessary to consider them in the view we take of the question raised by the motion made by defendant, for judgment in its favor notwithstanding the verdict, that question being, whether there was any evidence in the case sufficient to warrant the jury in finding that there was an implied authority in Mr. Close, or any one else, to make the contract in suit, by which plaintiff should have an exclusive right to place defendant's insurance on cars for a period of three years.

In accordance with the requirements of the Pennsylvania practice act of 1905 (P. L. 286), the motion for judgment non obstante veredicto having been refused in the court below, all the evidence in the case has been certified by the trial judge and sent up with the record now before us. A careful examination of this evidence fails to disclose any basis for the implication of authority in Close to make the exclusive contract with the plaintiff, which he signed on behalf of the company, and which was the contract here sued on. The evidence does not vary from or much, if at all, enlarge the scope of the course of dealing upon which the plaintiff avers in his statement of claim that he relied, as implying an authority on the part of Close or Wilson to make the contract in question. From these averments, as above summarized, it appears that these dealings between Close and the plaintiff were confined to the details of his employment, as broker, to procure insurance on separate motor cars of the defendant company against the losses incident to their use in its business, such as from fire, collision, or liability imputed to them for injuries occasioned by negligence of their employés. This business was transacted from time to time and almost daily, as new cars were purchased, and involved

the settlement and adjustment of losses occurring from time to time and the renewal of policies that were expiring. Each transaction was an individual one and stood by itself, the general employment of the plaintiff, as broker, being terminable at any moment and involving no obligation for continuance in the future. We can find nothing in the evidence which would differentiate this employment from the ordinary employment of an insurance broker to place insurance from time to time in respect to individual subjects of insurance, nor do we find that Close's conduct and activities in attending to the necessary details of insurance on the part of the company, with the plaintiff, differed at all from what would necessarily characterize the conduct and activities of an agent, held out as such by a corporation, for the transaction of those matters which are of constant or daily recurrence, and which could not be otherwise transacted without an inconvenience that would be prohibitive to the conduct of such business. The authority of such an agent is being evidenced constantly by the repetition of acts within the scope of his employment. Such acts, being necessarily or presumptively within the knowledge of the principal, common sense and usage hold him liable therefor, because he is estopped to deny such agency. Hence the customary or common law rule of implication of authority from the usual course of dealing by the agent, with a tacit consent or acquiescence of the principal.

But the limitations on this rule are no less clear and explicit. Story, in his work on Agency, says:

"If it" (this implication) "arises from the general habit of dealing between the particular parties, it is deemed to be limited to dealings of the same kind and governed by the same habits. * * * In short, an implied agency is never construed to extend beyond the obvious purposes for which it is apparently created."

This is universally accepted as the customary law of business, as well as the common law of England and this country.

The facts in evidence, from which the jury were permitted to infer authority in Close to make, in November, 1909, a contract, binding the defendant corporation to give to the plaintiff the exclusive right to place all its insurance for a term of three years, as already stated, do not differ materially or in substance from the averments contained in plaintiff's statement of claim. Though already summarized, they may be again outlined as follows:

The defendant is, as its name implies, a taxicab company. It was organized in May, 1908, one Hinckle being then its president. In June, 1908, Close was selected as its bookkeeper. He kept the books and accounts of the company and attended to the details of the office work. Hinckle selected a Mr. Addis as insurance broker for the company, and later, about September, 1908, he selected plaintiff for that service, whose first employment was in going over the then existing policies of the company and in making a report in regard thereto. He did this and saw Mr. Hinckle on various occasions in relation thereto, and the latter at last said he had turned the matter over to Close. Plaintiff then saw Close, who directed him to proceed to adjust the existing insurance in accordance with his report. He had no

exclusive contract, and would only place new insurance upon particular cars when requested so to do.   When losses occurred, he would settle with the insurance companies and credit defendant's account with the amount received.   When an insurance rate was raised, or the terms of a policy changed in any way, he would explain the matter to Close, and Close would approve of it on that explanation.  His accounts would be audited by Close, entered by him on the books, and all moneys paid would be received by him and deposited in the company's book account.   Some of these matters would be talked over with Mr. Wilson, the secretary, and they relied upon plaintiff, as insurance broker of the company, in all that he did.   In July, 1909, Mr. Kinsley was elected president of the company in place of Hinckle, but the insurance matters continued as before.   During all this time down to the making of the alleged new contract, Close never made any contract for defendant, either written or oral, prior to the contract in suit, except in so far as the direction by Close to the plaintiff, to make a particular insurance, implied a promise on the part of the company to pay the settled commissions for the same.

In the fall of 1909, dissatisfaction having arisen in regard to the fire and burglary insurance, which up to that time had been taken out in London Lloyds, Wilson and Close asked for bids from insurance brokers, and several bids were put in, including one from the plaintiff. The bids were scheduled by Close, and he and Wilson went over them and decided that plaintiff's bid was best, whereupon Wilson dictated and Close signed a letter of acceptance.   Neither Wilson nor Close were directors.   The by-laws did not authorize them, nor had they any authority from the board or the president to accept that bid, nor did they ever report their acceptance of it to the board of directors or to the president, nor is there any evidence to show that the board of directors, or any of them, or the president, had any knowledge of the acceptance of the bid by Close.   It is testified by the plaintiff himself, that what he did after November, 1909, under the alleged contract with Close, up to the time of its repudiation by the company in March, 1910, was nothing more than what he did under the original arrangement from September, 1908, to November, 1909, and that he was paid his commissions for all that was done.   So that there was nothing done by plaintiff, under the alleged contract, to indicate to the president or board of directors, or any one else, that he was claiming an exclusive contract to place all the defendant's insurance for three years.   Some time in February, 1910, the defendant had its attention called to the fact that plaintiff was claiming this exclusive right to place all defendant's insurance for three years, and they promptly, by resolution of the board of directors, repudiated the same and directed no more policies to be renewed by plaintiff until further notice.

These facts, though given in outline, fairly and accurately state the character and substance of the evidence submitted to the jury.   It is to be observed that, throughout this whole record, there is a total absence of any evidence to show that Close had ever made, on behalf of the defendant, any time contract concerning insurance, or any other matter, with the plaintiff or any other person.

We do not think the jury should have been permitted to infer from this evidence that Close was clothed with authority from the defendant to make a time contract with the plaintiff, binding the company, for whom he presumed to act, to put in the hands of the plaintiff all of their insurance business for a term of three years. The difference of such a transaction from what had been the ordinary course of business between Close and the plaintiff, is too great and obvious to permit of such an implication. Those former acts were merely the incidental transactions necessary to enable the insurance broker employed by the president of the company to place insurance from time to time upon particular cars, as it might be required. It is a startling proposition, that authority to bind the company for a period of years could be inferred from such acts. If for three years, why not for five or ten years?

We are compelled to conclude, therefore, that there were no facts to warrant the jury in so finding.

Though this was the only question passed upon by the jury, we must notice the second question submitted,—Did the defendant ratify the contract in question? That it did not do so expressly, is admitted. The only ground for this contention is, that after the unauthorized contract was made by Close with the plaintiff, the policies of insurance effected by him at the new rates were received and retained by the defendant. The new rates were only slightly better than the old, and the obtaining of them was quite within the natural scope of the employment of plaintiff, as it had previously existed. There was nothing in the acceptance of such policies, even though made for a term of three years instead of one, to call attention to the claim of plaintiff, that he had an exclusive right under his contract to place all the insurance of the defendant for three years. The obtaining of the new rates was a single act as to each policy, just as the obtaining of the old rates was a single act, and immediately thereafter, the services of the broker who obtained them could be discontinued and the policies retained. The same may be said as to the agreement under the new arrangement, that the policies were to run for three years. That did not imply that the broker was to be continued for three years, any more than, if the policies had been for one year or five years, there would be an implication that the broker who effected them was to be continued for one year or five years. It took no more time to place a policy for three years than for one year, and when done, there was no more implication than there was formerly, that the broker's services were to be continued thereafter. There is a total absence, therefore, of any facts in evidence, as disclosed by this record, from which knowledge of this exclusive contract and ratification thereof by the defendant could have been inferred, and that question, therefore, should not have been submitted to the jury.

We are compelled, therefore, to the conclusion that the motion for judgment non obstante veredicto should have been granted, and the judgment below is therefore reversed.