## GENERAL PAINT CORPORATION et al. v. KRAMER.

### No. 529.

Circuit Court of Appeals, Tenth Circuit.
March 24, 1932.

Rehearing Denied April 22, 1932.

A. A. Davidson, of Tulsa, Okl. (Preston C. West and West, Gibson, Sherman, Davidson & Hull, all of Tulsa, Okl., and Orrick, Palmer & Dahlquist, of San Francisco, Cal., on the brief), for appellants.

John H. Cantrell and A. J. Biddison, both of Tulsa, Okl. (Harry Campbell and Valjean Biddison, both of Tulsa, Okl., on the brief), for appellee.

Before LEWIS, COTTERAL, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge.

The defendants appeal from a judgment for $56,625 rendered upon the verdict of a jury. The plaintiff declared upon a breach of an oral contract of employment for his lifetime. The defendants denied the oral contract; denied the authority of the agent with whom the plaintiff claimed he dealt, to make such a contract; and objected to the introduction of any proof of such oral agreement, for that it altered the terms of a written contract of employment and contravened an applicable Oklahoma statute. Hill, Hubbell & Co. merged with the General Paint Corporation in October, 1928, retaining, however, its corporate existence;

for the purposes of this case, the two corporations may be treated as one. The proof most favorable to plaintiff disclosed the following state of facts:

The defendant corporations were engaged in the paint business, with broad corporate powers, including the power to acquire patent rights. D. W. Boylan was an executive officer of both companies, with power of managerial supervision over Oklahoma business. Plaintiff was continuously employed by the defendants from 1927 until his discharge in February, 1930. During 1928 the plaintiff invented certain valuable improvements for a wrapping machine used by the defendants in their business. Plaintiff was the legal and equitable owner of all rights to his inventions, save perhaps shop rights of his employers, not here questioned. In April, 1929, a written contract of employment was entered into between plaintiff and Hill, Hubbell & Co., and in May, 1929, a written contract of employment was entered into between plaintiff and the General Paint Corporation, on its own behalf and that of its subsidiaries. These contracts are substantially the same; the latter and controlling one is set out in the margin.[1]

[1] The Employee is employed for such services as the Company shall designate, at the rate of 400 00 Dollars per month, payable semi-monthly commencing * * * and continuing until the termination of this agreement. This agreement may be terminated without prior notice at any time by either the Company or the Employee, and upon such termination said compensation shall forthwith cease, except only for such balance as may be then unpaid up to the date of termination. No modification of this agreement shall be valid unless in writing endorsed hereon; provided the Company may increase the salary above stated at any time by endorsing such increase hereon, but such endorsement shall not modify the other terms or conditions of this contract, which shall continue to remain in full force and effect until terminated as above provided.

As one of the conditions to such employment and in part consideration of the payment of such compensation aforesaid, the Employee shall do all in his power to promote the interests of the Company and shall exercise his inventive faculties for the benefit of the Company. If the Employee shall discover or invent anything (whether or not at the request or upon the suggestion of the Company, or during regular hours of work, or otherwise, or during the term hereof) the same shall be the exclusive property of the Company. The Employee shall forthwith disclose in writing such discoveries or invention to executive officials of the Company but to no other person, and shall forthwith assign to the Company full and exclusive right to any discovery or invention and to any patent, to the full end of the term of such patent. The terms "discovery," "invention" and "anything," as used herein, each include the phrase "any new and useful art, machine, manufacture or composition of matter, or any new and useful improvements thereof, or any new, original and ornamental design for any article of manufacture." This agreement shall apply to all discoveries or inventions, whether sim-

. This contract does not cover the patent rights here involved, for plaintiff's rights to them attached before the contract was made. Over seasonable and vigorous objection, plaintiff testified to a conversation alleged to have been had between him and Mr. Boylan, in June, 1929, which was during the existence of this written contract of employment, as follows:

"A. I came out to the office, out on the Sand Springs road, and saw· Mr. Boylan, told him I would like for him to ride out with me to the Oklahoma Natural Gas yards where I was then setting up a wrapping machine for the Oklahoma Natural people. He rode out there with me and commended me very highly on the lay-out I was progressing on, and he said he kind of thought as soon as I got through he would have me make that change in the entire plant; that is, at Milwaukee and other places. After we talked awhile we got in the car and came back, and I asked him when he was going to have me go back to Milwaukee and the other plant, and he told me not to worry about that; that I would be taken care of, not to let that bother me at all, not to worry about it, that I would always be taken care of, and he said they were having, we were having, they were having some papers fixed up for the inventions and ideas that I had pertaining to the wrapping machine and that they would send them to me some of these days pretty soon, they would be coming along, for me to sign them and return them, mail them back, and have them taken care of; that I shouldn't worry, that I would always have a job the rest of my life at my present salary. * * *

"Q. After you got back to the plant did you have any further conversation with Mr. Boylan with reference to the transfer of the rights to these inventions? A. He said not to worry at all about it; take care of that sit-

uation when it is mailed to you, and you will always get your $400.00 a month.

"Q. Did you make any inquiry at that time as to what work there would be for you to do? A. He told me not to worry, there would be lots to do, would be plenty to do; they would call on me whenever they needed me."

On ˙August 21, 1929, attorneys for defendants sent to plaintiff, for his signature and return, applications for patents to the improvements in question and assignments thereof to defendants. Plaintiff signed as requested, and returned the papers on August 26. No mention of any agreement for life employment is mentioned in the correspondence. The assignments recite a consideration of "One Dollar ($1.00) and other good and valuable considerations received by the said assignor from said assignee aforesaid, the receipt of which is hereby acknowledged." The defendants have continued to use a part of plaintiff's inventions, and have retained the assignments to all of them.

There was no interruption in the employment, plaintiff drawing his salary each month, and reporting for such work as he might do, until January, 1930, when he was advised that the directors "had decided to let me go and that they didn't just want to turn me loose but wanted to give me $75.00 a month." Plaintiff refused to accept this, asserted that he had a different arrangement, and in March, 1930, filed this action. One of the counts was on quantum meruit for the value of the patent rights assigned, but this was dismissed before submission to the jury.

The defendants' evidence controverted the oral agreement testified to by plaintiff, but the verdict of the jury has settled that. Mr. Boylan testified as to his authority as follows: "I have no authority from either corporation to hire men for life. I have no authority from either corporation to hire men for any length of time. I have never at any time employed men for a definite period. I have never at any time employed men during their lifetime."

■ We are of the opinion that it was error to admit proof of the oral agreement. The effect of this conversation was to alter the written contract in one important particular, a change in the term of the employment from one at will to one for life. The parties remain the same, the salary the same, and there is no suggestion of any other change. The contract itself provides that. no

ilar to anything used in conjunction with the present business of the Company or radically different in principle or result therefrom. The Employee, upon request of the Company, shall forthwith execute all documents necessary or advisable in the opinion of the Company to direct the issuance of patents to the Company or to vest title in the Company to such inventions or discoveries. The expense of securing any patent shall be borne by the Company. The continuance of the Employee in the Company's employ for a definite period is not hereby made obligatory upon either party as a condition hereof. The Employee shall hold any secret process, formula, methods or appliances for which no patent is issued as trustee for the benefit of the Company.

This writing constitutes the whole agreement of the parties hereto, all prior contracts, understandings or representation being merged herein.

modification thereof shall be valid, unless in writing indorsed thereon. Moreover, the state of Oklahoma, where this contract was made and to be performed at least in part, and whose courts are asked to enforce it, has declared its public policy by a statute which reads: "A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise." C. O. S. 1921, § 5081.

The power to enact such a statute cannot be questioned. It is the same power which enables a state to enact statutes of frauds and perjuries. The Oklahoma courts have repeatedly sustained and applied the statute. Early v. King, 38 Okl. 206, 135 P. 286; Maisen v. Cartwright, 43 Okl. 737, 144 P. 375; Walker v. Johnson, 102 Okl. 9, 227 P. 113; Walker Drilling Co. v. Carlew, 109 Okl. 7, 234 P. 598; Newman v. Roach, 111 Okl. 269, 239 P. 640.

On the face of it, the evidence as to the oral agreement is in the teeth of this statute. The oral agreement altered one of the terms of the written contract of employment; the agreement was not in writing, and, of course, was not executed, as it could not be as long as plaintiff lived, for another Oklahoma statute prescribes that "an executed contract is one, the object of which is fully performed. All others are executory." C. O. S. 1921, § 5064. The plaintiff, however, argues, plausibly and foreibly, several reasons why the testimony was admissible. We turn to them.

█ 1. It is urged that the writing is not a contract at all; that, since either party might terminate the employment at any time, without notice or liability, neither party was bound for a moment of the future; that, at best, it is no more than a document which measures the rights of the parties as long as work was performed under it. In support of this contention, we are referred to the long line of decisions which deal with the so-called "will, wish or want" agreements, and which hold that an agreement of one to buy as much as he wills, wishes, or wants is not sufficient consideration to support the counter promise of the other to sell. Santaella & Co. v. Lange Co. (C. C. A. 8) 155 F. 719; Cold Blast Transp. Co. v. Kansas City Bolt & Nut Co. (C. C. A. 8) 114 F. 77, 57 L. R. A. 696; Curtiss Candy Co. v. Silberman (C. C. A. 6) 45 F.(2d) 451. We are in entire accord with the doctrine laid down by these cases, and, if the plaintiff were here suing because the defendants, after making the written contract, refused him any employment, we should hold that there was no contract for which a recovery could be had for breach of an agreement for future services. But we do not think the cases are in point. The question is not what liability exists on account of a breach of the written agreement; the question is, Is the writing a contract? If it is not a contract, one may well ask, what is it? True, it is terminable at will; but, under plaintiff's own theory, he worked under it from June until August. Having so worked, the writing contains enforceable agreements of both parties; agreements of defendants to pay $400 a month, and to pay the expense of securing patents on inventions of plaintiff during the period; agreements of plaintiff to disclose in writing discoveries made by him during that period to the defendants and not to disclose them to others. Here are mutual enforceable promises, and that makes a contract.

The plaintiff treats the writing as a "contract to employ." It is not. It is a contract of employment. The words are: "The employee is employed." By the signing of the contract, a status was created, and obligation immediately attached. The closest analogy to this writing is the ordinary contract of partnership. Partnership contracts are usually terminable at will; usually the partnership is created by the writing. It is academic that articles of partnership, although terminable at will, are nevertheless contracts which govern the rights and obligations of the partners for the period of the partnership.

█ But, if the writing be treated as a contract to employ in the future, it becomes a binding contract the moment that the plaintiff performs under it. Conceding that the mutual promises are so indefinite that neither is consideration for the other, the situation is changed when the parties perform; the performance becomes sufficient consideration. The precise point is covered in the Restatement of the Law of Contracts by the American Law Institute, § 33:

"An offer which is too indefinite to create a contract if verbally accepted, may, by entire or partial performance on the part of the offeree, create a contract.

"Illustration:

"1. A says to B: 'I will employ you for some time at $10 a day.' An acceptance by B either orally or in writing will not create a contract; but if B serves one or more days a unilateral contract arises binding A to pay $10 for each day's service."

Williston in his work on Contracts (sec-

tion 106) states the rule to the same effect: "But a promise that was originally too indefinite, may by performance, become definite and as the other party to the bargain must be regarded as continuously assenting to receive such performance in return for his own promise, a valid unilateral contract arises on receipt of such performance."

And in section 1013 Mr. Williston says: "In employments terminable at will, though the rights of the parties arising from present or past performance are governed by their contract continuously as the employment proceeds, there is no obligation as to the future."

It is conceded that plaintiff did work under this writing. The writing, therefore, is a contract. The Oklahoma statute is not limited to any particular class of contracts; it covers all contracts in writing. This statute, like the statute of frauds, reflects a sound public policy, and is entitled to, and the Oklahoma courts accord it, a liberal construction. We have neither the power nor the disposition to attempt to exclude one type of contract from its broad language.

■ 2. It is argued that the parties had a right, under the written contract, to terminate it at any time; that, having terminated it, the parties had a right to make a new contract. This may be conceded. But nothing of the kind was done. There is not a syllable of evidence from which an inference can be drawn that the employment was at any time terminated. On the contrary, the conversation out of which the oral agreement is evolved started with talk about the plaintiff going to Milwaukee to do certain work there. The whole talk contemplated a continuance of his employment, and not the termination of it. Plaintiff's claim is that the conversation amounted to an offer, which he accepted two months later by assigning the patents. But the dealings in August were by correspondence; and there is not even a hint that either of the parties in fact then exercised their option of terminating the old contract and making a new one. Since there is no evidence to support a claim of abrogation of the writing, we are not concerned with the question mooted in the briefs, of whether the Oklahoma court construes the statute as permitting oral proof of abrogation.

■ 3. It is then argued that the legal effect of the oral agreement was to terminate the written contract and to make a new and valid oral agreement. It is argued, and correctly, that the writing requires no set form of words or acts to terminate the employment; and that a contract for life employment is valid, although oral. It is therefore contended that the mere act of making a new oral contract, automatically and without more, terminated the old. The argument is ingenious and plausible, but it proves too much. If the argument is sound, the statute has no application to written contracts terminable at will; for, in every such case, proof of an unexecuted oral agreement which altered the writing must be received on the theory that the legal effect of such alteration was to put off the old and put on the new. We think contracts in writing, although terminable at will, are within the Oklahoma statute; if so, their terms cannot be altered, except as provided by the statute. We cannot accept the suggested legal fiction as a compliance with, or avoidance of, the legislative mandate.

■ 4. It is claimed that defendants are estopped to deny the oral agreement because they have retained the assignments which they secured by virtue of it. This is reasoning in a circle. If proof of the oral agreement is inadmissible, a breach of it cannot by estoppel make the proof admissible. We are dealing here with a question of the admissibility of evidence, and not with the question of the right of defendants to the patents. We conclude that there was error in receiving the proof of the oral agreement.

■ The trial court denied defendants' motion for an instructed verdict, and this ruling is assigned as error. The defendants contend that the uncontradicted evidence discloses that Boylan had no authority to bind the corporations by a contract for life employment. The only direct evidence on the subject was Boylan's testimony that he did not have, and never had exercised, such authority. The plaintiff relies upon his broad powers of management; and further contends that, if prior authority was not proven, the defendants retained the benefits of the unauthorized agreement after notice of it, and cannot escape its burdens.

First, of Boylan's authority. Mr. Mechem states the general rules as follows: "A general manager, put in complete charge of a business in which servants, and the like, are ordinarily employed would have implied authority, within the range of what is reasonable and proper, to employ the necessary help. In doing so, he may make contracts of a usual and reasonable sort, such as for example, the hiring of an employee for a

year; **or** the assumption of the risk of the employee's competency to fill the position." Mechem on Agency, § 988.

A contract for life employment is not within this rule; and authority to enter into such unusual and far-reaching contracts cannot lightly be implied. This rule is particularly applicable where the principal is a corporation. Corporation statutes contemplate the right of the stockholders periodically to change the management of the affairs of their corporation, by providing for annual or biennial election of directors. If corporate officers, or corporate directors, could enter into contracts giving persons of their selection employment for life, the power of the stockholders would be largely dissipated. We recognize that there are instances when such contracts are and should be upheld, as, for example, where, as an incident to a settlement for personal injuries, it is agreed to employ the injured one in some capacity not involving managerial responsibility. Pierce v. Tennessee Coal Co., 173 U. S. 1, 19 S. Ct. 335, 43 L. Ed. 591; Louisville & N. R. R. Co. v. Cox, 145 Ky. 667, 141 S. W. 389; Penn. Co. v. Dolan, 6 Ind. App. 109, 32 N. E. 802, 51 Am. St. Rep. 289; Jackson v. Ill. Cent. Ry. Co., 76 Miss. 607, 24 So. 874; Usher v. N. Y. Cent. & H. R. R. Co., 76 App. Div. 422, 78 N. Y. S. 508; Brighton v. Lake Shore & M. S. R. Co., 103 Mich. 420, 61 N. W. 550. There may be other instances where a contract for a term beyond that of the employing officer may be valid, as where the services bargained for are peculiarly necessary to the corporation, and where they cannot be secured except for a stated term. But we have no such situation here, and the general and salutary rule undoubtedly is, that authority to enter into contracts of employment for a term of years or for life is not to be implied from the power of management; and it is a matter of grave doubt whether a board of directors, elected for one year, can expressly authorize contracts that deprive succeeding boards of their statutory powers of management. Rennie v. Mut. Life Ins. Co. (C. C. A. 1) 176 F. 202; Penn. Taximeter Cab Co. v. Cressey (C. C. A. 3) 191 F. 337, 341; Powers v. Rutland R. R. Co., 88 Vt. 376, 92 A. 463, 466; Camacho v. Hamilton Bank Note Co., 2 App. Div. 369, 37 N. Y. S. 725; Maxson v. Michigan Cent. Ry. Co., 117 Mich. 218, 75 N. W. 459; Laird v. Mich. Lubricator Co., 153 Mich. 53, 116 N. W. 534, 17 L. R. A. (N. S.) 177; Carney v. N. Y. Life Ins. Co., 162 N. Y.

453, 57 N. E. 78, 49 L. R. A. 471, 76 Am. St. Rep. 347.

 It is suggested that the corporations had power to acquire patents, by purchase or otherwise, that Boylan was authorized to acquire patents for the corporations, and that what he did was to acquire patents from plaintiff, and that the life employment was the consideration paid for the assignments. We are not satisfied that there is any proof of Boylan's authority to acquire patents for the corporations. A president, as such, has no such power; general managers are not authorized as a matter of law to acquire new properties; and there is no proof of the actual or apparent authority of Boylan to purchase patents. But we do not stop on the point, because the power to acquire patents includes only the power to acquire them in ordinary and customary ways, such as a purchase for cash or upon a royalty agreement; such authority, if he had it, cannot be stretched to cover the making of unusual and extraordinary contracts in connection therewith. The power of an officer to purchase a patent cannot validate an unauthorized employment for life, or any other unusual or exceptional contract. We conclude that there was no evidence to support the finding of the jury that Boylan had actual, implied, or apparent authority to enter into this contract.

 Plaintiff relies strongly upon the proposition that defendants have retained, and still retain, the assignments; that a jury has found that the oral contract was made, therefore it was made; that defendants had notice of such oral contract, both because the knowledge of Boylan was their knowledge, and because the petition herein notified them thereof. Therefore plaintiff concludes, having knowledge of the unauthorized contract, they have ratified it by failure to restore the fruits thereof.

This court has had occasion to state and affirm the wholesome doctrine that, where one has knowledge that another has purported to act for him without authority, he cannot retain the benefits of the act and escape the burdens. United States v. Carbon County Land Co. (C. C. A.) 46 F.(2d) 980, affirmed 283 U. S. 816, 51 S. Ct. 658, 75 L. Ed. 1432; Maryland Casualty Co. v. Beebe (C. C. A.) 54 F.(2d) 743, and cases cited, page 746. But are defendants retaining the fruits of the unauthorized contract, or are they asserting title through another source? The plaintiff assumes that defendants predicate their

claim to these patents upon the oral agreement; and, if this assumption is sound, the conclusion would follow, for defendants could not base a claim to ownership upon an agent's contract, and then challenge his authority to make the contract. To put it in conventional form, "if the principal elects to ratify any part of the unauthorized act, he must, so far as it is entire, ratify the whole of it. He cannot avail himself of it so far as it is advantageous to him, and reject it as to the residue. He cannot take the benefits and repudiate the obligations." Mechem on Agency, § 410. But defendants do not base their rights to these patents upon the unauthorized act of Boylan; in their answer and their brief, they assert title through the assignments which, rightly or wrongly, they say plaintiff was obligated to make by his written contract. A principal who, though mistakenly, asserts title through one source, does not thereby ratify unauthorized acts connected with another source which the principal at all times disclaims. The solution of this entire controversy appears to be this: The defendants assert title through the assignments made, as they claim, because of the obligations of the written contracts. They disclaim any other right to the patents. They may be wrong. But such a mistake as to their rights cannot be contorted into a ratification of another source of title, to wit, an unauthorized act, the occurrence of which they deny, and which they disclaim in its entirety. For, as Judge Learned Hand once said, speaking of election of remedies: "That would be to put him, not to an election, but to a correct estimate of his right under pain of forfeiture." Buchhalter v. Rude (C. C. A. 10) 54 F.(2d) 834, 838; Midland Savings & Loan Co. v. Tradesmen's National Bank (C. C. A. 10) 57 F.(2d) 686.

 Furthermore, the cornerstone of ratification is knowledge of all material facts. Boylan's knowledge of the oral contract is not imputable to the defendants. As to this, Mr. Mechem says: "The knowledge which shall bind the principal may also, of course, be the knowledge possessed by some other agent having a general authority in the matter, and which may be imputed to the principal in accordance with the general rule making notice to an agent notice to his principal. But the knowledge of the particular alleged agent himself of his own unauthorized act cannot thus be imputed to the principal, in such manner as to satisfy the requirement of knowledge by the principal; for, as to the matter in question, the person acting is not agent until ratification, and it cannot be said that the principal has ratified with knowledge at the time of ratification, simply because the person who thus becomes agent had knowledge." Mechem on Agency, § 407.

The first knowledge or notice which defendants had of this oral contract was when the petition was filed, or a few days before. It is a very serious question whether notice of plaintiff's *claim* that an oral contract was made, which Boylan denied, satisfies the requirement of *knowledge* of the contract; defendants did not *know* an oral agreement was made; what they knew was that plaintiff so claimed. But, if we assume that such notice was knowledge, we must find some evidence of ratification thereafter. The record discloses none. Instead of ratifying, the defendants immediately repudiated the alleged agreement of Boylan; they denied that he made such agreement, denied his authority to do so, if he did make it; and disavowed it in its entirety. True, they retained the assignments; but, as we have seen, their right to retain them was based on a separate and distinct transaction; and the assertion of such a right, although erroneous, is no evidence of ratification of a disconnected and unauthorized act. We conclude that the court erred in denying the motion for an instructed verdict. The cause is reversed and remanded for further proceedings in accordance with this opinion.

Reversed and remanded.