## PLANT v. WHITE RIVER LUMBER CO.
### No. 10017.

Circuit Court of Appeals, Eighth Circuit.
March 4, 1935.

J. B. Daggett, of Marianna, Ark., and J. G. Burke, of Helena, Ark. (John P. Lee, of Clarendon, Ark., John W. Moncrief, of Stuttgart, Ark., John I. Moore, of Helena, Ark., C. E. Daggett, of Marianna, Ark., and John I. Moore, Jr., of Helena, Ark., on the brief), for appellant.

Thomas S. Buzbee, of Little Rock, Ark. (H. T. Harrison, A. S. Buzbee, and Edward L. Wright, all of Little Rock, Ark., on the brief), for appellee.

Before GARDNER, SANBORN, and VAN VALKENBURGH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

This is an action at law for breach of an alleged contract for cutting timber. Appellee is a corporation with a capital stock of $220,600, organized under the laws of the state of Michigan, and authorized to do business in the state of Arkansas. It was the owner of 45,000 acres of timberland in four counties of the latter state. For a time, in connection with such ownership, it operated a sawmill and lumber yard in the town of Clarendon, Ark. Its home office was at Kalamazoo, Mich. One W. W. Keaton of Clarendon, Ark., was employed by said appellee as "Manager of Logging Operations in the State of Arkansas," on the terms and conditions of a written contract, dated July 15, 1919. This contract provided that, as such manager, Keaton should devote his entire time and energy to the business, should have surveys made of appellee's holdings, employ men necessary to the work, market the product, attend to the payment of taxes, and perform such services as might be required in the state of Arkansas in the interest of appellee. It was stated that the logging operations were to be conducted on a large scale, and it was hoped to produce an output of twenty million feet per annum. A salary of $400 per month was stipulated, and the term of employment was thus fixed·

"It is understood this agreement shall continue for the period of one year from this date, provided, however, that either party to this agreement may terminate the same upon giving the other party ninety days' notice to that effect in writing."

This contract was continued from year to year without change except in the amount of the salary. Keaton continued to work for appellee until May 31, 1929. The business at first consisted in buying and selling logs, and in making contracts for that purpose. In 1925, however, the company built a sawmill and established a lumber yard at Clarendon, Ark. This mill was operated until late in 1927. The mill had a capacity of about 800,000 feet of logs per month; and, during the period of its operation, the business of the company was confined chiefly to the purchase and procurement of logs to feed that capacity. In his position as manager of logging operations Keaton made seasonal contracts for the cutting and purchase of logs incidental to the conduct of appellee's business. These contracts were for comparatively small amounts, the largest shown involving not more than 2,000,000 feet, and all requiring completion seasonably, and within a few months from their date.

January 20, 1927, is the date of the alleged contract upon which this litigation is founded. By its terms appellant was granted the right, for the compensation therein named, to cut all the merchantable timber owned by appellee in the state of Arkansas. It is conceded that the amount of timber thus contracted to be cut was about 120,000,000 feet. The contract provided for a minimum cut of 10,000,000 feet of logs per year, at a price which called for a minimum expenditure of $75,000 per year, or a minimum total of about $1,000,000 for the twelve years, which would be required, at this rate, to cut and remove the timber from appellee's lands. The contract purports to be signed by Keaton, as manager, on behalf of appellee.

It is to be noted that this contract undertook to provide not merely for the current requirements of appellee's business, but, rather, for the disposal of the entire timber holdings of appellee in the state of Arkansas, and required an expenditure, over the twelve years, necessary to its performance, of more than four times the entire capital stock of the lumber company. The contract was not authorized by the board of directors of the company, nor was it brought to the attention of its officers, or Mr. Altland, its then managing director. Nothing was ever done under it. September 23, 1933, appellant brought suit in a state court, alleging that appellee had breached the contract by refusal to perform, and by disposal, in 1929 and 1930, of a large quantity of its timber to other people. Damages for loss of profits were laid at $155,000. This action was removed to the District Court of the United States for the Eastern District of Arkansas. Up-

on trial, at the close of the testimony, that court, on motion, directed a verdict in favor of appellee. This action of the trial court is the main error assigned in this appeal.

The case turns largely upon the authority of Keaton to bind appellee by the contract in suit. Concededly he had no express authority to do so, and the question presented is whether such authority is implied from the nature of his employment. Appellant invokes the conceded rule that "the law implies that the agent is authorized to do and perform all acts reasonably necessary and proper to carry into effect the main authority conferred." Appellee relies upon the equally sound converse of this proposition; that is, "that the principal is not bound by the acts of an agent which are not within the scope of the duties ordinarily conferred* upon agencies of that character, nor when the transaction is of a nature so unusual and extraordinary that the other party should be put upon inquiry to ascertain the authority of the agent." In determining the class to which Keaton's agency belongs it is necessary to consider some significant features of the business of appellee, the nature of Keaton's activities, and the scope of the transaction covered by the contract in suit. Keaton was not a general agent in the accepted sense of that term. He was manager of logging operations, which consisted in procuring logs by purchase from others, or by cutting and hauling from appellee's own lands, to be worked in its sawmill at Clarendon, and disposed of in the form of lumber from its yard at that place. True, Keaton was given liberal authority within this sphere; but manifestly that authority was restricted to what was incidental to the express character of his employment, and did not extend to the exercise of those powers inherent exclusively in ownership. Such powers were vested in a board of directors, as the governing body of the corporation, and, in that body, one of its number, D. F. Altland, had been especially designated as the managing director. In his letter to Mr. Altland of October 11, 1927, nearly nine months after the date of the contract in suit, Keaton makes no mention of it, but says, "We are getting all of our log supply from outside sources." At no time did he submit this contract to the lumber company, nor did he seek authority from its board of directors, nor from any one who could have been conceived to have jurisdiction over it. Not only so, but in letters to other parties, beginning in April, 1927, and extending to August of that year, he solicited logging operations apparently inconsistent with an existing contract with appellant Plant. To one A. N. Roberts of LaGrange, Ark., he wrote as follows April 13, 1927:

"We are ready to begin making our plans for logging the coming season and would like to see you as soon as it is convenient for you. We have several offers from parties who want to take over all of our logging and we have concluded that we would like to handle it that way, and as you have been logging for us we want to give you the preference if you can do the work at the same price."

In a letter to H. H. Ramsey of St. Charles, Arkansas, dated August 27, 1927, he said:

"We note that you have bought about 80 M' on railroad and if you can get these loaded out in time for the Wednesday morning local they will reach us in time to prevent us from having to shut down next week. Please get after these people and see that they load them promptly."

Keaton explains as his reason for making the Plant contract that the logging operations had been carried on by farmers who would only log part of the year; that these farmers did not know how to cut and put out the logs to advantage, and that damage to the timber and increased costs had resulted; that appellant had sold logs to the company at different times; that his logging operations for the company had been satisfactory; that "Plant had a good outfit, and it was natural that he should prefer giving him the logging job." The foregoing would seem to furnish a sound reason for making contracts within seasonal periods and carefully limited; but lends no support to committing appellee to an arrangement whereby its entire timber assets were to be disposed of at great cost, and over a protracted period, without reference to the business hazards that might be encountered during that period.

It would seem that nothing short of formal action by the governing body of the corporation could justify such drastic action. Those potential hazards, against which sound business judgment must ever be on guard, became realities. Persistent floods in 1927, 1928, and 1929, overflowed the town of Clarendon, destroying the mill yards of the White River Lumber Company. The

depression followed, and the company found it necessary to make sales of its timber lands. Nothing whatever has been done under this contract of date January 20, 1927. Appellant has incurred no expense in the way of preparation and equipment. He explains his failure to enter upon the logging activities, covered in the contract, by the existence of floods in 1927, 1928, and 1929, which would have made the removal of timber during those years unprofitable, and says he waited for some time at the request of Keaton. He states the breach upon which he sues as follows:

"In violation of the aforesaid contract and without the knowledge or consent of plaintiff, defendant, in the latter part of the year 1929 and by the first day of January, 1930, sold a large quantity of said timber to other people and still later and in violation of the contract with plaintiff and without the knowledge or consent of plaintiff sold another large quantity of said timber to other people."

It is significant that this suit was not filed until nearly three years after the date last mentioned, and nearly six years after the contract purports to have been executed. There is much in the record to cast doubt upon the existence of a valid and enforceable contract in the minds of Keaton and appellant, but, from the standpoint of a directed verdict, we do not place our conclusion upon that ground.

In our judgment Keaton had no authority to bind appellee by a contract so unusual in its nature and so manifestly beyond the reasonable scope of his employment. And we think, in any event, that the circumstances were such as to charge appellant with notice of the apparent limitations upon Keaton's authority. The inquiry demanded would have disclosed that authority was lacking.

 Counsel for appellant have cited many decisions of this and other courts to the effect that, in considering motions for directed verdicts, the court must ascribe to plaintiff's evidence and the inferences therefrom the most favorable aspect warranted thereby; that, though the facts be undisputed, the question is for the jury if different inferences may reasonably be drawn from such facts; that, ordinarily, the credibility of witnesses is for the jury; and that a corporation cannot deny the authority of its agents to make contracts apparently within the scope of their authority, where such contracts are not ultra vires. Man-

chester Mill & Elevator Co. v. Strong (C. C. A. 8) 231 F. 876; Swift & Co. v. Detroit Rock Salt Co. (C. C. A. 6) 233 F. 231; Chicago & N. W. Ry. Co. v. Struthers (C. C. A. 8) 52 F.(2d) 88; Asher et al. v. United States (C. C. A. 8) 63 F.(2d) 20; Philadelphia Storage Battery Co. v. Kelley-How-Thomson Co. (C. C. A. 8) 64 F.(2d) 834; Union Indemnity Co. v. Home Trust Co. (C. C. A. 8) 64 F.(2d) 906; Chicago, M. St. P. & P. R. Co. v. Linehan (C. C. A. 8) 66 F.(2d) 373; Wharton v. Ætna Life Ins. Co. (C. C. A. 8) 48 F.(2d) 37; Wisconsin & Arkansas Lumber Co. v. Day (C. C. A. 8) 35 F.(2d) 563; Lyons Milling Co. v. Goffe & Carkener, Inc. (C. C. A. 10) 46 F.(2d) 241, 83 A. L. R. 501. There can be no question of the soundness of these principles announced where applicable, but we do not think their application demands a disposition of this case favorably to appellant. The question here is not whether Keaton was authorized to make contracts, but whether he had apparent and ostensible authority to bind his principal to an arrangement whereby its entire property in the state of Arkansas was to be disposed of, and its business activities in that state placed beyond the control of its governing body for the protracted period of twelve years. Keaton's employment was for a period of one year and was subject to termination upon ninety days' notice at any time. Giving to all the testimony and evidence offered its full probative effect, it is at least doubtful if either Keaton or Plant regarded this contract as effective beyond the ordinary seasonal period, if at all. However, courts generally have dealt satisfactorily with similar situations. There is a difference between general authority to bind a principal in the course of a known business, and one to dispose of the entire corpus of a corporation. Anderson-Tully Co. v. Gillett Lumber Co., 155 Ark. 224–234, 244 S. W. 26. The general manager of a corporation has no implied authority to bind it by a sale of its physical properties. Nor can such a sale, if made, be ratified by officers of the corporation, who, themselves, have no such power. Morning Star Mining Co. v. Bennett, 164 Ark. 244, 251, 261 S. W. 639.

The "authority to enter into such unusual and far-reaching contracts cannot lightly be implied. * * * The general and salutary rule undoubtedly is, that authority to enter into contracts of employment for a term of years or for life is not to be im-

plied from the power of management; and it is a matter of grave doubt whether a board of directors, elected for one year, can expressly authorize contracts that deprive succeeding boards of their statutory powers of management." General Paint Corporation v. Kramer (C. C. A. 10) 57 F.(2d) 698, 703. Counsel for appellant criticise this citation upon the ground that it involves an employment contract, and that the rule of law announced is not applicable here. This basis of distinction is not well-founded. The rule applies to all cases which involve the power of an agent and its reasonable exercise. Compare Floyd Acceptances, 7 Wall. 666, 19 L. Ed. 169.

"No presumption of law can be indulged in that, because a person acts as such a manager, he has the power to bind his principal to contracts of an extraordinary nature, and of such a character as would involve the corporation in enormous obligations and for long periods of time." Camacho v. Hamilton Bank Note & Engraving Co., 2 App. Div. 369, 37 N. Y. S. 725, quoted with approval in Laird v. Michigan Lubricator Co., 153 Mich. 52, 116 N. W. 534, 535, 17 L. R. A. (N. S.) 177.

"A general agent has no implied authority to bind his principal by contracts unusual to agencies of like character, or beyond the usual scope of such agencies; and when he attempts to bind his principal by his extraordinary acts, the one dealing with him is put upon notice, and required to ascertain from some authoritative source whether such agent had the power to bind his principal thereby.

"One who has been employed as a field superintendent of logging operations, with authority to have timber cut from time to time as needed for a corporation, his principal, and subject to be discharged at any time, has no implied authority to bind his principal with an indefinite contract for cutting the timber from a large tract of land which might last for years, and involving the expenditure of many thousands of dollars, and in an action to recover damages for a breach of the contract it is necessary for the plaintiff to show that the agent had express authority or that the principal ratified his act." Chesson v. Richmond Cedar Works, 172 N. C. 32, 89 S. E. 800, L. R. A. 1918F, 6.

In the foregoing case the contract was made by a field superintendent of logging operations, with authority to have timber cut from time to time as needed. It authorized Chesson to cut and top all the merchantable juniper timber of the defendant company upon a tract of 5,000 or more acres. The operation of the contract might have extended over twenty years, and the amount of the compensation claimed might have aggregated $60,000. Compare Rennie v. Mutual Life Ins. Co. (C. C. A. 1) 176 F. 202. In Pennsylvania Taximeter Cab Co. v. Cressey (C. C. A. 3) 191 F. 337, it was held that the fact that an officer of a taxicab company, acting under authority from the company, employed an insurance broker to place insurance on its cars from time to time as new cars were purchased or existing insurance expired, gave such officer no implied authority to bind the company by a contract to give the broker all of its insurance business for a term of three years or for any other term. In the case before us no ratification of Keaton's action is shown, nor estoppel by reason of part performance or expenditure made in reliance upon the agent's authority to contract.

Where there is no substantial dispute as to the facts, "whether the contract is reasonable, is for the court, and not for the jury." Carney v. New York Life Ins. Co., 162 N. Y. 453, 57 N. E. 78, 79, 49 L. R. A. 471, 76 Am. St. Rep. 347.

"It is the duty of the trial court to direct a verdict at the close of the evidence in two classes of cases: (1) That class in which the evidence is undisputed; and (2) that class in which the evidence is conflicting, but is of so conclusive a character that the court, in the exercise of a sound judicial discretion, ought to set aside a verdict in opposition to it." New Amsterdam Casualty Co. v. Farmers' Co-op. Union (C. C. A. 8) 2 F.(2d) 214, 215, and cases cited.

"Upon a motion for a peremptory instruction the question is not whether there is literally no evidence, but whether there is any upon which a jury can properly find a verdict for the party producing it, upon whom the onus of proof is imposed." Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 74 L. Ed. 720.

We think the action of the trial court in sustaining the motion of appellee for a directed verdict is amply sustained by the record. Two assignments as to exclusion of evidence require attention. It appears that Mr. William K. Wallace became president of the lumber company either late

in 1927 or in 1928. In the course of the trial, the following took place:

"Q. (By counsel for appellant) Tell the jury whether or not this contract with Mr. Plant was ever discussed with Mr. Wallace or not? A. Mr. Wallace came to Clarendon in, I don't remember the date, it was the first time I had ever seen him.

"Mr. Buzbee: I object to that, if the court please, for the same reason that objection was made to other testimony. This was long after the contract was made.

"The Court: I don't think it is competent, Mr. Daggett, unless you could show a proper ratification of the contract by the proper officers of the company. Of course any conversation you might have had with any individual stockholder or director would not be proper to show the power and authority to make this contract.

"Mr. Daggett: How about the president of the company?

"The Court: No, it would not show that he had authority.

"Mr. Daggett: I want to note an exception to that. I want to call the court's attention to this, if your honor please, and they state in their answer, their answer here, that they plead lack of knowledge and that he had no authority to make this contract.

"The Court: They did not know anything about it until it was executed, and not before."

It will be noted that no offer of proof was made, and there is nothing in the record to show the purpose or possible effect of the testimony sought to be elicited. If we may assume that that purpose was to show ratification of the contract in suit, such ratification by the president, if attempted, would have been ineffectual.

■ Counsel also complain of the action of the trial court in refusing to permit the introduction of a letter to Keaton from David F. Altland, managing director of appellee, dated January 21, 1930. That letter contained the content of a resolution adopted by the board of directors of the White River Lumber Company, as follows:

"It was moved by Mr. Altland and seconded by Mr. Campbell that the treasurer pay Mr. William Keaton his salary of $500.-00 for the month of May, 1929, within thirty days from January 20, 1930; and that the directors of the White River Lumber Company go on record as being of the opin-

ion that Mr. Keaton, during his management of the company, rendered faithful and efficient services."

This resolution contains no reference to the contract in suit, nor any intimation that anything respecting it had been before the board. It was clearly incompetent. The allegations of appellant's complaint are that appellee's actions had been antagonistic to the terms of said contract long prior to the date of the Altland letter. Being of opinion that the motion for a directed verdict was properly sustained, we hold that the judgment below should be, and is, affirmed.