H. H. Lewis, Appellant, v. Minnesota Mutual Life Insurance Company et al., Appellees.

No. 47319.

(Reported in 37 N. W. 2d 316)

May 3, 1949.

Rehearing Denied September 23, 1949.

Bradshaw, Fowler, Proctor & Fairgrave, of Des Moines, for appellant.

Henry & Henry, of Des Moines, for appellees.

Hale, C. J.—The original majority opinion in this case was filed December 14, 1948. There was a dissent, and later, on application, a rehearing was granted. We herein reaffirm the original opinion with supplemental comments, all of which are

embodied in the present opinion. The original opinion is therefore withdrawn and this opinion is substituted for it.

Plaintiff seeks recovery of damages for claimed breach of a contract of agency entered into between the plaintiff and the defendants. It is his contention that the written contract which he had with the Minnesota Mutual Life Insurance Company and T. D. Carnahan, its general agent, was modified by an oral contract by which the defendant company agreed to retain him as an agent for his lifetime. Plaintiff claims that this modified contract was terminated by the defendants without cause and that he was damaged thereby. The case was tried to a jury which returned a verdict in plaintiff's favor. Thereafter the trial court sustained defendants' motion for judgment notwithstanding the verdict on the ground that the evidence was not sufficient to show that the prior written contract of agency had been modified so as to provide for a lifetime agreement. Other grounds of the motion were overruled. Judgment was entered in defendants' favor and plaintiff has appealed.

The Minnesota Mutual Life Insurance Company has its home office in St. Paul, Minnesota. It is licensed to do business in Iowa. T. D. Carnahan is a general agent of the defendant company with offices in Des Moines. He has a general agency contract with the company covering thirty-five counties in central Iowa.

On November 1, 1943, the plaintiff entered into an agency contract with T. D. Carnahan, the general agent, as a party of the second part, and the Minnesota Mutual Life Insurance Company as party of the third part. This contract provided that the agency "* * * shall continue during the will and pleasure of the parties hereto subject to termination by any party hereto at any time upon at least fifteen days written notice to the other party; provided, however, that termination for violation of the terms hereof may be made effective immediately upon notice. * * *" The contract further provided for renewal commissions on premiums paid on policies for the second to the tenth policy years inclusive. It also provided that if the agency agreement was terminated there should be deducted from the renewal commissions due the agent a collection fee of two per cent of the five per cent renewal commission. It also provided

that in writing most of the different types of insurance there would be a five per cent renewal commission on subsequent yearly premiums paid. By charging against the renewal premium two per cent of the five per cent, it is shown by the record and discussed in the briefs that the plaintiff was charged a collection fee of forty per cent on the renewal commissions due him. The defendant company does not deny liability for sixty per cent of the renewal commissions due the plaintiff. The forty per cent collection charge against the agent's renewal commission is paid to the general agent for the resulting work and responsibility of collecting the premiums due.

The evidence relative to the purported oral modification of the written agency contract presented by the plaintiff discloses that by July 1945 he was one of the company's leading producing agents, that at or about this time he had received offers of employment in other types of business and that because of this fact he communicated with Harold J. Cummings, vice-president and superintendent of agencies of the defendant company. He received a reply from this official of the company suggesting that he come to St. Paul and there confer with Mr. Cummings and Mr. Carnahan relative to the matters mentioned in plaintiff's letter and that they would spend some time in fishing. The plaintiff and Carnahan made the trip to St. Paul. During the time they were fishing, Mr. Cummings, according to the plaintiff's testimony, discussed the other offers that had been made the plaintiff and is purported to have stated: "Do you think it would be better for Hu Lewis in the long run than a lifetime contract with the Minnesota Mutual?" Lewis' testimony discloses that his reply in part was: "I want to make a decision at my age once and for all. I want to know what my future is going to be for my life security." Cummings is also purported to have later said to Lewis: "* * * it is up to you to make your own decision, that a lifetime arrangement with the Minnesota Mutual and with Carnahan would be to your advantage. There will be two or three reasons why it would be. One is that an insurance organization is a life organization. It goes on and on and on even after individuals replace themselves, and you have got the security with this life association for your future. * * * another thing is your renewals which you

have asked about and which under your present contract would not be valid if you took one of these other offers immediately, because you have not been with the organization quite the minimum date that is required * * * and a lifetime contract with the company, you would not need to worry about your renewals, they would be pyramiding and built up. * * * would talk to Tom [Carnahan] about the idea of a lifetime arrangement or contract with me and also would suggest that the company would immediately organize a training course * * * that would give me information that would be helpful along with the other type of information that he would suggest to Mr. Carnahan * * *."

The plaintiff also testified that after his return to St. Paul from the fishing trip he had a conversation with Mr. Carnahan which was in part as follows: "I said that Harold had mentioned that I should reject these other offers that I had received and make a lifetime contract with Minnesota Mutual, and he said that was a good idea, or that was fine." It is further shown by the plaintiff's testimony that later that evening there was a social function at Mr. Cummings' home and while they were on the front porch Cummings is purported to have said to Lewis, "Hu, have you reached any definite decision about our conversation regarding your future association about—as to a lifetime contract with the Minnesota Mutual Life Insurance Company?" Lewis replied: "Yes, I believe that I had, depending of course upon himself and upon what Mr. Carnahan's decision might be." Cummings then said, according to Lewis' testimony: "Tom, I suggest that Hu's possibility in the life insurance business is rather definite and rather permanent, and I think he should stay with us and work with us during his lifetime. I think he should forget these other offers or turn them down, and I think he should also—he also mentioned at that time that he should use our advertising and promotional facilities and things, and use his own judgment in any other things that he might feel would be to advantage on the firing line to secure business. * * * 'What do you think'?" According to plaintiff's testimony, Carnahan then said: "Fine. He ought to lead the company in production." Cummings then said: "Is that agreeable with you, Hu?" Lewis then replied: "It is, providing we

are all agreed that it is a lifetime future and a lifetime association." Cummings then replied: "I am glad we are all agreed." Carnahan during this conversation, according to the plaintiff, said: " 'I am glad that Hu has decided to make a lifetime contract to work.' * * * He was glad that Hu had decided to work for us the rest of his life. * * * I don't remember the exact words." Cummings denied that he said in Carnahan's presence that Lewis ought to stay with the company for his life. His testimony is that: "If you take out the words 'lifetime contract' it is entirely likely, though I don't remember talking to them in the swing distinctly at all." He also testified:

"The term 'lifetime contract' is a novelty to me. It has never been in my mind that I had a right to make a lifetime contract and I have never made one. I don't recall using such a term such as lifetime. I did not use the words 'lifetime contract' in discussing Lewis' connection with the Minnesota Mutual. I have never used the words lifetime contract with any other agents in the history of the company. I did not tell Lewis that the advantage of a lifetime contract would be that the company would go on and his renewals would pile up and that with a lifetime contract he would have a continuous lifetime income. We have no lifetime contract with anybody inside or outside of the home office, never have had in all my years. I have explained to many an agent how his renewal income could pile up if he stayed with the business and worked on it, but that is quite another matter than talking about a lifetime job. I don't remember telling Lewis that I would talk to Carnahan about giving him a lifetime contract. I have never thought in terms of a lifetime contract with anybody, didn't think I had any right to do so."

Carnahan denied that he had ever been a party to any conversation with the plaintiff or Mr. Cummings wherein the question of a lifetime contract for Lewis was discussed.

There is testimony of a Mr. and Mrs. Charles R. Brookins that about the 15th of December, 1945, they were in the office of Mr. Carnahan along with Mr. Lewis discussing the possibility of Brookins becoming associated with the Minnesota Mutual Life Insurance Company and that at that time Mr. Carnahan

said that Brookins "would have the same type of contract as Mr. Lewis pertaining to a lifetime deal."

. The evidence discloses that in the late afternoon of February 17, 1947, Mr. Carnahan called the plaintiff on the telephone and advised him that his contract with the Minnesota Mutual was terminated immediately and that he should not keep any more appointments or deliver any more policies. Lewis later contacted Mr. Cummings by long-distance telephone in St. Paul and advised him as to these developments. Cummings stated that he would get hold of Carnahan the following day and discuss it with him and then call the plaintiff.

We shall not here comment on the several claims for damages or other testimony presented as the foregoing sets out the matters which are material to a determination of this case in this court. The motion for judgment notwithstanding the verdict·was upon the following grounds:

1.  That the evidence was not sufficient to support a verdict that the contract was actually altered to cover the plaintiff's lifetime.

2.  That even if so altered, there was no evidence that the provision for termination at will was rescinded, and therefore the contract remained terminable at will.

3.  That even if so altered, it was terminable at will because there was no mutuality of obligation.

4.  That even if there was a wrongful termination, the plaintiff did not offer sufficient evidence from which the jury could determine the amount of his damages with reasonable certainty.

5.  (This ground not argued in this court.)

6.  That there was no evidence to show that Mr. Cummings was authorized to enter into a lifetime contract of agency and the same was not binding upon the company.

This motion was sustained as to paragraph 1 and overruled as to the other paragraphs.

I. The granting of a judgment notwithstanding verdict is provided for in our Rule 243 of our Rules of Civil Procedure. See also Code section 11553, 1939 Code. Subparagraph (b) of Rule 243 provides that:

1256

"If the movant was entitled to have a verdict directed for him at the close of all the evidence, and moved therefor, and the jury did not return such verdict, the court may then either grant a new trial or enter judgment as though it had directed a verdict for the movant."

See Jensvold v. Chicago Great Western R. Co., 236 Iowa 708, 715, 18 N. W. 2d 616.

II. In consideration of the motion for judgment notwithstanding verdict presented in this case we are confronted with the question whether, under the entire record, the court would have been justified in directing a verdict for the defendants at the close of all the evidence. In considering said motion we should follow the same rule we have universally applied in consideration of a motion for a directed verdict, and that is, the evidence as presented and the record made should be considered in the light most favorable to the party against whom the verdict is asked. Our holdings on this question have been so universal that the citation of authorities is not here necessary.

III. Although the trial court sustained the motion for judgment notwithstanding the verdict on the sole ground that the evidence was not sufficient to support the verdict that the contract was actually modified to cover the plaintiff's lifetime yet it is incumbent upon this court to give consideration not only to this first ground of the defendants' motion but also the other grounds set forth. We have held that if there are any grounds in the record upon which a court's ruling can be sustained we should follow the trial court even though it based its holding on some other ground. Cotton v. Southwestern Mutual Life Ins. Co., 115 Iowa 729, 732, 87 N. W. 675; Vincent v. Ellis, 116 Iowa 609, 617, 618, 88 N. W. 836; Western Fruit & Candy Co. v. McFarland, 188 Iowa 204, 217, 174 N. W. 57.

IV. We must not only give consideration to the first ground of plaintiff's motion, but should also keep in mind our previously announced rule that the evidence presented should be considered in the light most favorable to the party against whom the motion is directed and certain other principles of law concerning which we shall comment.

The plaintiff's claim for damages is based upon the cancellation of his claimed lifetime contract. In considering a contract of this character we should give attention to the statements of this and other courts relative to such agreements. In the case of Paisley v. Lucas, 346 Mo. 827, 842, 843, 143 S. W. 2d 262, 270, 271, the Missouri court in commenting upon this question quoted from the case of James Maccalum Printing Co. v. Graphite Compendius Co., 150 Mo. App. 383, 391, 392, 130 S. W. 836, 838, as follows:

" 'The courts are prone to hold against the theory that a contract confers a perpetuity of right or imposes a perpetuity of obligation. Yet it seems to be the law in this state that where the intention to do this is unequivocally expressed, the contract will be upheld. * * * But in this jurisdiction, as in others, courts will construe a contract to impose an obligation in perpetuity only when the language of the agreement compels that construction.' "

Later in the Paisley case it is stated by the writer of that opinion that: "A contract for life will be upheld only where the intention, that the contract's duration is for life, is clearly expressed in unequivocal terms."

In the case of Faulkner v. Des Moines Drug Co., 117 Iowa 120, 122, 123, 90 N. W. 585, 586, this court made a statement which is quite applicable to the instant case and is as follows:

"It is not conceivable that in entering into the contract in suit plaintiff supposed he was entering a service from which nothing but death or the consent of the defendant could relieve him. It is equally incredible that defendant supposed or understood that it was thereby taking into its employment a person whom it was bound to retain in its service until such time as that person should consent to his own discharge. If we should hold the contract enforceable according to its literal terms, the defendant could never abandon or sell or dispose of its business without plaintiff's consent, even though its prosecution entailed certain loss or bankruptcy * * *."

A review of the record satisfies us that there was an insufficiency of evidence to show that the contract was modified.

1258

At most it is shown that there was some consideration given to a change of contract but we are unable to hold that it was definitely modified. The evidence is too indefinite.

As to the definiteness of a contract it is stated in Ingram-Day Lumber Co. v. Rodgers, 105 Miss. 244, 62 So. 230, 48 L. R. A., N. S., 435, Ann. Cas. 1916E 174, that the terms of a contract must be complete and sufficiently definite to enable the court to determine whether it has been performed or not. The terms and conditions are not sufficiently definite unless the court can determine therefrom the measure of damages in the case of a breach. In the case now before us it is the plaintiff's claim that the company was under obligation to give him lifetime employment but there is nothing in the claimed modified contract by which the plaintiff was obligated to continue in employment for any length of time. There is not sufficient evidence of a contract by which the defendants could be held to any definite damages.

The argument that there is no decision comparable factually to the case at bar is incorrect. There are numerous cases where the facts are similar. See Heideman v. Tall's Travel Shops, 192 Wash. 513, 515, 73 P. 2d 1323, 1324, where it is claimed that the plaintiff testified that the president of the defendant company told him: " 'You can work as long as you live. Your whole life you can work. * * * you have a life job.' " In Gensman v. West Coast Power Co., 3 Wash. 2d 404, 101 P. 2d 316, the plaintiff's testimony was that the defendant's president told him that he would have a job as long as he wanted to work. In Lightcap v. Keaggy, 128 Pa. Super. 348, 354, 194 A. 347, 349, 350, the plaintiff's testimony was that the defendant " 'said he wanted me to go to Greensburg for a life position' [handling the defendant's property]—'to go to Greensburg for a life job at $100 a month.' " In Minter v. Tootle-Campbell Dry Goods Co., 187 Mo. App. 16, 20, 22, 173 S. W. 4, 5, 6, the testimony showed that the defendant wrote letters to the plaintiff telling him: "* * * 'if you accept this position with us, it would be a permanent one. I want you to come with the intention of staying permanently,' " and that he was told orally, " ' * * * we want you to feel like you are right with us and one of us, and that you are here as long as you live, as long as you can

stay on your feet.' " The plaintiff agreed that he would come and serve the defendant the balance of his life.

These cases were not only stronger in their facts than the present case, but each one involved a contract of employment by which the plaintiff agreed to perform specified services for the defendant, as distinguished from a contract of agency. The holding in all of these cases was that no lifetime contract existed.

In the case of Faulkner v. Des Moines Drug Co., supra, the agreement was for employment at twenty-five per cent of the net profits until mutually agreed void. Since such agreement, if enforceable, could only be terminated by the consent of both parties, it would be indistinguishable from a life contract, but in that case the court held that it was unenforceable or uncertain as to time of employment, and further held that it was unenforceable by reason of the fact that there was no basis or standard upon which the damages for breach of contract could be ascertained. This case is cited and approved in Gould v. Gunn, 161 Iowa 155, 140 N. W. 380. See also Eggers v. Armour & Co. of Delaware, 8 Cir., Iowa, 129 F. 2d 729, 731; annotation 135 A. L. R. 682; Ingram-Day Lumber Co. v. Rodgers, supra, in which, like the Faulkner case, the contract was held void because of indefiniteness. The case of Kaufman Bros. & Co. v. Farley Mfg. Co., 78 Iowa 679, 43 N. W. 612, 16 Am. St. Rep. 462, was not an action for future profits but for damages for expenditures already made.

For other cases dealing with indefiniteness of lifetime contracts see Maxson v. Michigan Cent. R. Co., 117 Mich. 218, 75 N. W. 459, 461; Hess v. Iowa Light, Heat & Power Co., 207 Iowa 820, 825, 221 N. W. 194.

The contention of defendants is that in the absence of some addition to the services to be rendered there was no more than an indefinite general hiring, terminable at will. See Heideman v. Tall's Travel Shops, Lightcap v. Keaggy, and Minter v. Tootle-Campbell Dry Goods Co., all supra. This is the holding in Lynas v. Maxwell Farms, 279 Mich. 684, 687, 273 N. W. 315, 316, where it is stated: "* * * in the absence of distinguishing features or provisions or a consideration in addition to the

services to be rendered, such contracts are indefinite hirings, terminable at the will of either party." Citing cases.

It was held in Rape v. Mobile & Ohio R. Co., 136 Miss. 38, 100 So. 585, 35 A. L. R. 1422, 1427, that the expense incurred by an employee in moving to the place of employment did not constitute a sufficient consideration to support a claimed agreement for permanent employment. For annotations bearing on this question reference is here made to 35 A. L. R. 1432, and 135 A. L. R. 646. See also Edwards v. Kentucky Utilities Co., 286 Ky. 341, 150 S. W. 2d 916, 135 A. L. R. 642, 644, 645.

■ V. In the instant case there is an absence of evidence showing that there was any additional consideration for the claimed lifetime agreement. The giving up of the opportunity to take other employment cannot be held to be an additional consideration. Skagerberg v. Blandin Paper Co., 197 Minn. 291, 266 N. W. 872. This contention is assailed on the theory that the promise of the plaintiff to work for the defendants for life is a sufficient consideration for the alleged lifetime contract. The contention of the plaintiff is that there can be a valid contract if it is supported by mutual promises, but in the cases cited in support thereof were contracts of specific employment which created the relationship of employer and employee and definite promises to perform specific services, contrary to the facts in this case.

We will consider cases cited. In Littell v. Evening Star Newspaper Co., 73 App. D. C. 409, 120 F. 2d 36, there was a finding that there was no contract of permanent employment. In Eggers v. Armour & Co. of Delaware, supra, the plaintiff proved he was employed as a watchman or any work that he was physically able to perform. In the case of Abbott v. Arkansas Utilities Co., 8 Cir., Ark., 165 F. 2d 339, the plaintiff agreed to serve as consulting engineer for the defendant and hold himself in readiness at all times to act in that capacity, and not to engage in any work that would be in conflict with the interest of the defendant. Each case differs from the facts in this case, and so in Elwell v. State Mutual Life Assur. Co., 230 Mass. 248, 119 N. E. 794, which was not a case for the loss of future profits but for renewal commissions as provided in the contract. In such cases, however, after the court found that the

contract for lifetime employment existed, the contracts in question created the relationship of employer and employee, and the plaintiff promised to perform specific services or such services as were required by the employer. The most that is claimed in this case is that the plaintiff agreed to "work" for the defendants. In the present case, under section seven (a) of the original contract it is distinctly stated that this is not a contract of employment.

### "Not a Contract of Employment"

"Section Seven (a) It is specifically understood that this is not a contract of employment, and nothing contained herein shall be construed to create the relationship of employer and employee between the Company and the Agent or between the General Agent and the Agent. Within the territory herein designated, the Agent shall be free to exercise his own judgment and discretion as to the persons from whom he will solicit applications for policies, as to the time and place of solicitation, and as to the methods by which the desired results are to be obtained; but the Company may from time to time prescribe rules and regulations with respect to conduct of the business covered hereby, not interfering with such freedom of action of the Agent, which rules and regulations the Agent will conform to and observe."

In Iowa the effect of the contract just quoted is determined in the case of Meredith Publishing Co. v. Iowa Employment Sec. Comm., 232 Iowa 666, 6 N. W. 2d 6, which was a case where the claimant sold magazine subscriptions under a contract which also specifically provided it should not be construed as creating the relationship of employer and employee—practically the same as the contract considered in this case. It was there held that one who solicited subscriptions for a magazine under a similar contract was an independent contractor and not an employee. See also Arne v. Western Silo Co., 214 Iowa 511, 242 N. W. 539; Arthur v. Marble Rock Consolidated Sch. Dist., 209 Iowa 280, 228 N. W. 70, 66 A. L. R. 718; Pace v. Appanoose County, 184 Iowa 498, 168 N. W. 916. Defendants' argument on rehearing calls attention to the fact that the contract to work was not an exclusive one.

It is claimed that the promise to turn down the other offers finds support in certain cases cited, none of which holds that the mere rejection of other offers of employment as distinguished from the giving up of actual existing employment or an independent business constitutes such an additional consideration. It is urged that the promise by the plaintiff to turn down other offers was an additional consideration for the modification of the original contract. We do not think the authorities support such a conclusion.

In Fletcher v. Agar Mfg. Corp., D. C. Mo., 45 F. Supp. 650, the contract of employment was based on the agreement of the plaintiff that he relinquish his own competitive business and devote his whole time to the service of the defendant. In Riefkin v. Du Pont de Nemours & Co., 53 App. D. C. 311, 290 F. 286, the contract was based upon the agreement of plaintiff to resign his position with the United States government, which he did. In Carnig v. Carr, 167 Mass. 544, 46 N. E. 117, 35 L. R. A. 512, 57 Am. St. Rep. 488, the plaintiff agreed to give up his business and work for the defendant in the same occupation, but the sufficiency of this agreement, if an additional consideration, was not the basis of the decision. It was likewise held in that case that it was not, nor was it contended to be, a life employment. In Lucacher v. Kerson, 158 Pa. Super. 437, 45 A. 2d 245, the plaintiff was required to resign his former employment and move from New York to Philadelphia. In Millsap v. National Funding Corp., 57 Cal. App. 2d 772, 135 P. 2d 407, and Weber v. Perry, 201 S. C. 8, 21 S. E. 2d 193, the plaintiff in each case abandoned his own business as part of the agreement.

The defendants argue that the only case relating to the rejection of another offer is Skagerberg v. Blandin Paper Co., supra, where it was held not to constitute an additional consideration. Kirkley v. Roberts Co., 268 Mass. 246, 167 N. E. 289, is cited by plaintiff in his argument on rehearing, but the consideration expressed was that plaintiff would leave his then employer and go with defendant, and plaintiff did so under a written agreement. See also the editorial statement of the rule in 35 A. L. R. 1432:

"In most of the jurisdictions passing on the duration of

a contract purporting to be for permanent employment, it is held that, in the absence of additional express or implied stipulation as to the duration of the employment or of a good consideration additional to the services contracted to be rendered, a contract for permanent employment, for life employment, for as long as the employee chooses, or for other terms purporting permanent employment, is no more than an indefinite general hiring terminable at the will of either party." Citing cases.

VI. It has been uniformly held that where one party to a contract is not bound to perform it and cannot be held liable for failure of performance there is a lack of mutuality and it is unenforceable. We hold that there was no mutuality of obligation in the so-called lifetime contract because Lewis was under no obligation to continue his service as an agent for the period of his lifetime. This is denied by plaintiff who claims Lewis did testify that he promised to remain as a subagent for the remainder of his life. We doubt that the record shows any such express agreement. What seems to be considered by the plaintiff as such an agreement was a conversation which was casual, at best, and the agreement, if it be called such, was when Cummings, a vice-president of the company, the general agent and the plaintiff in a general conversation were discussing the plaintiff's relation to the company, and, as heretofore stated, Cummings, the vice-president, mentioned to Carnahan, in one part of the conversation: "Tom, I suggested that Hu's possibility in the life insurance business is rather definite and rather permanent, and I think he should stay with us and work for us during his lifetime." To Lewis, Cummings stated: "Is that agreeable to you, Hu?" And he (Lewis) said: "It is, providing that we are all agreed that it is a lifetime future and a lifetime association," and Cummings said: "Fine. I am glad we are all agreed."

On the basis of such alleged promises plaintiff claims modification of his original contract. This was not a case of employment. The agent was an independent contractor and not an employee. See original contract. Under his original agreement he could choose his own time, his manner of work, and do as little or as much as he chose in soliciting applications

for the defendants. He was free to go to any place within his territory to visit such prospects as he desired or free not to solicit at all. See Neola Elevator Co. v. Kruckman, 185 Iowa 1254, 1256, 171 N. W. 743; Harrison v. Kelly, 212 Ark. 447, 206 S. W. 2d 184, 185; Campbell v. American Handle Co., 117 Mo. App. 19, 94 S. W. 815, 816; International Shoe Co. v. Lacy, 114 Ind. App. 641, 53 N. E. 2d 636, 639; Swart v. Huston, 154 Kan. 182, 117 P. 2d 576, 579; Baker Co. v. Ballantine & Sons, 127 Conn. 680, 20 A. 2d 82, 83, 137 A. L. R. 916; Terre Haute Brewing Co. v. Dugan, 8 Cir., Mo., 102 F. 2d 425, 427; Dupont de Nemours & Co. v. Claiborne-Reno Co., 8 Cir., Iowa, 64 F. 2d 224, 232, 89 A. L. R. 238.

It is argued by plaintiff that if the contract should be breached by Lewis the Minnesota Mutual would have the remedies afforded for the breach of any contract. This is erroneous, as the company would have no remedy if Lewis had done no work under the contract or had failed to secure the minimum twelve applications. He could have gone to work in other business or for other insurance companies and nothing in the agreement or modification of the original contract afforded the defendant company any remedy. It must be remembered that the contract and the alleged modification thereof were not exclusive. He was, in effect, a free agent and could occupy his territory without interference from his company if the contract was as alleged by him and with no right on their part to terminate, except for reasons specified in the original contract. The detriment to the company of such an agreement, should he so choose, is obvious. The only right of termination given in the contract is for the violation of the terms thereof, and the only breach would be the failure to remit premiums collected, or the solicitation of applications in territory in which he or the company was not licensed. If plaintiff's argument is correct, then "the defendants were tied to the plaintiff for the remainder of his natural life, no matter how he conducted himself, unless he committed a breach of one of the above provisions, while he remained absolutely free to devote to the sale of life insurance as much or as little time as he saw fit or in fact to do nothing whatever under the agency contract," as stated by defendants in argument. Mere lack of mutuality in and of itself does not

render a contract invalid. Standard Oil Co. v. Veland, 207 Iowa 1340, 224 N. W. 467. However, this is not all the statement of the court in that case. In the opinion by Justice Evans it is stated at page 1343 of 207 Iowa, page 469 of 224 N. W.:

"If the lack of mutuality amounts to a lack of consideration, then the contract is invalid. But mere lack of mutuality, in and of itself, does not render a contract invalid. If mutual promises be the mutual consideration of a contract, *then each promise must be enforcible, in order to render the other enforcible.* Though consideration is essential to the validity of a contract, it is not essential that such consideration consist of a mutual promise. A promissory note for a consideration is valid, though no mutuality appear thereon. This is true of all unilateral contracts which are supported by a consideration." (Italics ours.)

It is apparent that the promise of Lewis to work for the defendants was not enforceable since whether he worked or did not work, whether he took up outside lines of employment or did not, the amount of service which he rendered to the defendants would be entirely at his own option and he would not be financially liable for a failure. If Lewis could refuse at will to continue to solicit applications for life insurance in the defendant company, which in practical effect was a revocation, the right to mutuality of contract must be granted to the defendants. See Terre Haute Brewing Co. v. Dugan, supra. But it is contended that even though there was lack of mutuality there was still a valid consideration, plaintiff urging that the promise to reject other offers of employment was a valid consideration. Such a rejection was not an additional consideration to the promise to render service.

Plaintiff refers to Kirkley v. Roberts Co., supra, where an existing position was given up. In the Kirkley case the contract was a contract of employment which created the relationship of employer and employee and which bound the plaintiff to give his sole and undivided attention to his employment and to faithfully and diligently perform the duties thereof. Plaintiff's counsel contend that Lewis promised "to work" for the defendants and that this was a sufficient consideration to create a valid nonterminable lifetime contract. The weight of au-

thority is contrary to this contention. See authorities heretofore cited, also, Wallach v. Mendelson, 115 Misc. 499, 501, 188 N. Y. Supp. 809, 810, in which it is said:

"If the plaintiff has under his agreement the power to keep his promise to continue in the employ of the defendant and yet devote to his employment as much or as little time as he chooses, or in fact to perform no services under his employment, then the performance of his promise would clearly constitute no detriment to him and no benefit to the defendants."

The additional considerations suggested by plaintiff and specified by him were provisions of the original written contract. They cannot be a consideration for the alleged oral modification of the contract so as to make it a nonterminable contract to run for the plaintiff's lifetime. There was nothing in the alleged oral modification to constitute any promise on his part to devote his full time. In cases cited by counsel for the plaintiff which involved contracts of sales agencies, which the court termed valid and enforceable, we do not find any support for the view that the contract at bar is valid because there is mutuality of obligation. In Hichhorn, Mack & Co. v. Bradley, 117 Iowa 130, 90 N. W. 592; Huntington v. Haish Co., 190 Iowa 1197, 181 N. W. 480, and Atlas Brewing Co. v. Huffman, 217 Iowa 1217, 252 N. W. 133, no question was raised that the contract lacked mutuality of obligation.

Counsel for plaintiff also referred to cases involving certain sales-agency contracts as in Rosenberger & Co. v. Marsh & Co., 108 Iowa 47, 78 N. W. 837. The question of mutuality was not involved for the court found there was no agreement as the defendants claimed. Also, in Kaufman Bros. & Co. v. Farley Mfg. Co., supra, the contract was a contract of sale and not a contract of agency. As argued by defendants in their brief on resubmission, plaintiff referred to the value of the exclusive right to sell a certain brand of cigarettes, and being put to the expense of building up the trade. There was no claim for loss of future profits, but plaintiff merely sought damages for expenditures already made. See also Faulkner v. Des Moines Drug Co. and Swart v. Huston, both supra. We are satisfied that the

plaintiff has not shown mutuality of obligation, or consideration for the alleged modification of the original contract.

As to damages, it is argued by plaintiff that this is not an issue on this appeal, but that he was entitled to damages for $511.20 representing renewal commissions withheld to the date of the trial, and $2882.61 representing the agreed present value of renewal commissions to be withheld in the future on business written by plaintiff while he was with the company. The difficulty about the allowance of such amounts is that the jury, presumably acting under the instructions, specifically limited the plaintiff's damages to loss of future profits and did not include renewal commissions or retained collection fees as an element of damages. There was no exception to these instructions, but they were instructed in instruction 5 that the measure of plaintiff's damages was the profits or commissions which he would have earned had the so-called lifetime contract been carried out, less his expenses and the value of his time. In instruction 8 the court told the jury that the amount of the plaintiff's recovery, if any, for diminished profits or earnings resulting from the alleged wrongful termination of his contract would be the present worth of such diminished earnings, exceeding in no event the sum of $54,000.

While the plaintiff in written reply argument cites Pierce v. Tennessee Coal, Iron & Railroad Co., 173 U. S. 1, 19 S. Ct. 335, 43 L. Ed. 591, involving the breach of a contract for life employment at a specified wage in settlement for a claim for injury, it is not applicable here where there is no obligation of performance on the plaintiff and no definite compensation. See Faulkner v. Des Moines Drug Co. and Ingram-Day Lumber Co. v. Rodgers, both supra.

VII. Another question that was presented in connection with defendants' motion for judgment notwithstanding the verdict was the matter of the authority of Harold J. Cummings as vice-president of the defendant company to modify the prior written agreement and enter into a lifetime contract. In the case of Ney v. Eastern Iowa Tel. Co., 162 Iowa 525, 144 N. W. 383, this court discussed extensively the question of the authority of an official to bind a corporation when there is no showing that the board of directors had acted on the matter in controversy.

It was therein held that under such circumstances the corporation could not be held under a claimed contract with the president.

The case of Heaman v. Rowell Co., 261 N. Y. 229, 231, 185 N. E. 83, 84, succinctly sets forth what we find the courts generally hold relative to the authority of a president to bind a corporation in the claimed making of a lifetime contract. It is therein stated as follows:

"Alleged contracts of life employment are, however, so unusual as to have been, with rare exceptions, condemned by the courts as unreasonable and unauthorized. The president or other executive officer of a corporation has no authority as such to make a contract that one should remain in the corporate employ for life even under a general power 'to appoint, remove and fix the compensation of employees.' That any board of directors or other persons responsible for the management of a corporation should give such unusual power to an executive officer cannot be implied. Plain language of the managing board, clearly showing that such was the intention of the corporation, coupled with power actually or impliedly vested in the corporation itself, must be found to justify such a hiring." Citing cases.

Other authorities on this same question include in part the following: First National Bk. v. Cement Products Co., 209 Iowa 358, 360, 227 N. W. 908; General Paint Corp. v. Kramer, 10 Cir., Okla., 57 F. 2d 698, 703, and cases cited; Horvath v. Sheridan-Wyoming Coal Co., 58 Wyo. 211, 131 P. 2d 315, 318, 320; Carney v. New York Life Ins. Co., 162 N. Y. 453, 57 N. E. 78, 49 L. R. A. 471, 76 Am. St. Rep. 347; Langer v. Superior Steel Corp., 318 Pa. 490, 178 A. 490; Severance v. Heyl & Patterson, 123 Pa. Super. 553, 187 A. 53; Malcolm v. Travelers Ins. Co., 275 Mass. 190, 175 N. E. 477; Kline v. Thompson, 206 Wis. 464, 240 N. W. 128, 130, 131; Foley v. Wabasha-Nelson Bridge Co., 207 Minn. 399, 291 N. W. 903; Pedicord v. Elm Grove Mining Co., 110 W. Va. 116, 157 S. E. 89, 91; Rasnick v. Ritter Lumber Co., 187 Ky. 523, 219 S. W. 801, 802.

There is no evidence presented on the part of the plaintiff that Harold J. Cummings had authority to enter into the

claimed lifetime contract. In fact the by-laws which were introduced in evidence definitely provide that vice-presidents of the company shall have only such power and perform such duties as may be assigned to them by the board of trustees or the president. These by-laws also disclose that there shall be an agency committee which shall have general supervision over the agents of the company and shall have power to regulate and control the agency policies of the company. It is therefore very definitely shown that the defendant company had in no way authorized Cummings, the vice-president, to enter into such a contract as claimed by plaintiff. On the contrary it is shown that a vice-president would not have had such authority to enter into such an agreement.

It is suggested that on the question of authority apparently either the by-laws are subject to some exceptions or the matter was later reported to the agency committee. Of course there was no evidence of that nature, and this is merely a suggestion without any evidential basis whatever or any inference which could be drawn from any of the evidence, and in such cases, with nothing before it, the jury had no right and could not determine that such was the fact. An assumption is no fact, nor an evidential basis to support an inference that such a contract was reported to the agency committee. Defendants in their original argument cited numerous cases on authority. Plaintiff in his reply brief also cites a number of cases, some of which were the same as referred to by the defendants, and are relied upon by plaintiff as supporting plaintiff's contention as to authority. We shall refer to these.

In Riefkin v. Du Pont de Nemours & Co., Kirkley v. Roberts Co., and Littell v. Evening Star Newspaper Co., all supra, the question of authority of a corporate officer to bind the corporation was not involved. The remaining cases may be considered as follows: '

1. Authority may be assumed in matters pertaining to the ordinary course of business in the absence of evidence showing direct lack of authority as shown by Citizens Bank v. Public Drug Co., 190 Iowa 983, 181 N. W. 274, in which there was a question for the jury as to whether a note made by the president and general manager in the scope of the company's regular

business and to evidence a corporate debt for goods furnished and used by the defendant was authorized; Glens Falls Indemnity Co. v. Palmetto Bank, D. C. S. C., 23 F. Supp. 844, involving the endorsement by an assistant treasurer of checks received in the ordinary course of business; White v. Elgin Creamery Co., 108 Iowa 522, 79 N. W. 283, involving a contract ratified by the president and majority stockholder for the purchase of milk for his creamery as part of its ordinary business; Webster County Buick Co. v. Nebraska Buick Auto. Co., 216 Iowa 485, 249 N. W. 203, involving a bonus agreement with a salesman similar to previous ones negotiated annually for at least ten years and a part of a plan to maintain service in the territory involved.

2. There is no lack of authority when there has been approval or subsequent ratification by authorized officers, and to sustain this proposition see Fletcher v. Agar Mfg. Corp., supra, involving approval, and of ratification in Baltimore & Ohio R. Co. v. Foar, 7 Cir., Ind., 84 F. 2d 67; White v. Elgin Creamery Co. and Webster County Buick Co. v. Nebraska Buick Auto. Co., both supra.

3. Contracts by a subordinate officer in an emergency are binding on the corporation because of the necessity of prompt action in such an emergency. Citing Hahnemann Hospital v. Golo Slipper Co., 135 Pa. Super. 398, 5 A. 2d 605. In the absence of an emergency defendants cite various cases, but there was no emergency in the present case.

4. An exception in the case of contracts for life employment in a capacity not involving responsibility, made in the settlement of claims for personal injuries, see Royster Guano Co. v. Hall, 4 Cir., N. C., 68 F. 2d 533, and Eggers v. Armour & Co. of Delaware, supra, where the employee was disabled in the line of duty. Other cases support the exception to the general rule which is also referred to as an exception in the Eggers case.

5. The majority of courts have made a special exception to a general rule with respect to the authority of stock selling agents to make contracts for the repurchase of corporate stocks. Citing Murray v. Standard Pecan Co., 309 Ill. 226, 140 N. E. 834, 31 A. L. R. 604, and annotation 607. This is on the theory

that the corporation by accepting the money ratifies the agent's agreement. See Wright v. Iowa Power & Light Co., 223 Iowa 1192, 274 N. W. 892. But this opinion also states that there was no evidence whatever by defendant to prove lack of authority. In the present case there is ample evidence of lack of authority.

In the Baltimore & Ohio R. Co. case, supra, there was evidence of ratification and the agreement was admitted, but in the present case the agreement was denied, and there could be no inference, therefore, that if Cummings had acted without authority that he had reported the agreement to the board of trustees. The Eggers case, supra, was an exception to the general rule, as it concerned a contract with a disabled employee which the court said could not be distinguished from a contract made in settlement of a claim for personal injuries. In the case of Grismore v. Consolidated Products Co., 232 Iowa 328, 5 N. W. 2d 646, the court held that the kind of advice which resulted in the injuries to certain turkeys was with the knowledge of a superior agent of the company in the part of the business of selling turkey feed. The court held that the evidence made a jury question as to whether the agent acted within the scope of his authority. In the present case the plaintiff did not agree to perform any specific services. The contract was a contract of agency and not a contract of employment. There was no evidence of ratification and no evidence from which ratification could be inferred, and the alleged contract was beyond the usual course of business.

Defendants' counsel in argument urge that the contract might prove a very serious burden to the defendants in that plaintiff had already had some bitter controversy with the general agent and was guilty of conduct which would promote trouble in the agency and interfere with the building up and maintaining an efficient and harmonious organization; that it would be hard to believe that an experienced superintendent of agencies or general agent would bind himself to give an agent a lifetime job with no other consideration on the agent's part than a promise to continue. Citing and quoting Faulkner v. Des Moines Drug Co., supra, in which the court said at page 122 of 117 Iowa, page 586 of 90 N. W.:

"It is equally incredible that defendant supposed or understood that it was thereby taking into its employment a person whom it was bound to retain in its service until such time as that person should consent to his own discharge."

We are satisfied that on the question of authority the motion for judgment notwithstanding the verdict was properly sustained.

We have followed carefully the arguments of counsel. We are satisfied that the questions raised by plaintiff have been fully answered by the defendants; that the action of the district court in sustaining the motion for judgment notwithstanding the verdict was correct and should be and is affirmed. The original opinion in this case is hereby withdrawn and this opinion substituted therefor.—Affirmed.

SMITH, MANTZ, WENNERSTRUM, and HAYS, JJ., concur.

OLIVER, BLISS, GARFIELD, and MULRONEY, JJ., dissent.

OLIVER, J. (dissenting)—Defendant Minnesota Mutual Life Insurance Company had more than three hundred agents in thirty-one states. The subagents' contract made by defendants with plaintiff, Lewis, November 1, 1943, was a complete contract of considerable length upon the printed form of the Minnesota Mutual. It is entitled "Agents Contract." It provides, in part: The general agent (Carnahan), pursuant to his contract with the company "hereby appoints" Lewis "as Agent to procure applications for policies on the lives of persons satisfactory to the Company" and to collect and remit first-year premiums, etc., subject to the provisions hereof. Lewis "hereby accepts said appointment and the Company approves the same. * * * The agency relationship hereby established" is subject to termination by any party upon fifteen days' notice and may be terminated immediately for violation of its terms. Termination of the General Agents Contract with the company shall not terminate the agency relationship hereby established between the agent and the company. A schedule of commissions on premiums is set out. After two years the agent will be entitled to commissions or renewals as long as he procures twelve new applications per year. "After termination of the agency relationship

hereby established" the agent is charged a so-called collection fee of a certain per cent of said renewal commissions. The Agents Contract is "not a contract of employment" and does not create the relationship of employer and employee. The agent may exercise his own judgment and discretion as to the time, place and methods of solicitation and persons solicited but the company may prescribe rules and regulations not interfering with such freedom of action, which rules and regulations the agent will observe.

This was plaintiff's first experience selling life insurance. His record was phenomenal. By March 1945, he was selling more Minnesota Mutual insurance than any other salesman. He was first in the President's Dozen (twelve leading salesmen) and was consistently a member of the 50 Club ($50,000 per month). March 21, 1945, Harold J. Cummings, vice-president in charge of agencies, wrote Lewis, in part:

"It shouldn't be possible that a man should be leading the President's Dozen for the year whom I have not had the privilege of meeting personally. It should never have happened either that following the General Agency Conference here at the end of January, I was so crowded for time that I couldn't write and say thanks to you for having over $100,000 of business in one month."

In May another letter from Cummings complimented Lewis for "doing a fine job." About this time Lewis' name and picture began to appear in the company magazine "Application." In 1946, several laudatory articles in the magazine referred at length to his methods of operation and the quantity and quality of business done by him. As a select salesman he was paid additional compensation direct from Vice-president Cummings Agencies Department, called Club credits and not mentioned in his written contract.

July 10, 1945, Lewis wrote, in part:

"Dear Mr. Cummings: I am writing you for information not now available locally. The reason is because recently I have been approached by representatives of three excellent organizations with unlimited possibilities * * * all affording

attractive personnel connections and environment, and obviously all combining lucrative salary and bonus appeals, which is important, tho secondary if adequate.

"This has developed so quickly during the past two weeks that the different times I have gone to office intending to discuss same with your local Mr. Carnahan, I have missed him.

"Since Mr. Carnahan has now gone on a vacation, and an important decision, to me, may be required before his return about the 23rd inst.—will you therefore kindly advise my status regarding first year and renewal commissions should I decide to make a sudden change.

"I am undecided today, there are reasons why I would like to continue with Minnesota Mutual, and other good reasons for considering connections suggested, and offered to me that might prove much more satisfactory."

Cummings replied that upon receipt of the letter (at the St. Paul office of the company) he promptly discussed it with Mr. Elston (one of the three superintendents of agencies), who attempted to phone Lewis but learned he would be absent from Des Moines for several days. "I sincerely hope that you will not do anything in a hurry, because I would certainly want a chance to talk this thing out with you and I am sure Tom [Carnahan] would want the same opportunity." The letter suggests Lewis come to St. Paul at company expense, "we can find ample time to discuss your problem to your hearts content", or that Lewis and Tom spend a day or two with Cummings on the St. Croix River, or something of the sort, and that Lewis telephone Cummings concerning the situation, whether he would come and if so, when. "Meantime, let's hold everything please."

A few days later Cummings wrote Lewis he had made reservations for a trip on the St. Croix River, etc., for Carnahan and Lewis. "I am assuming the personal matter mentioned in your earlier correspondence can be left for a thorough discussion while you are here."

Lewis and Carnahan flew to St. Paul. Mr. Cummings had secured rooms for them at the St. Paul Athletic Club for Thursday night. Friday Lewis was conducted on a tour of the home

offices. In the afternoon he met Mr. Cummings. Later Cummings took them on a deluxe fishing trip from which they returned Saturday. Saturday evening they attended a buffet dinner at the Cummings home and then were taken to an ice revue at the Coliseum. Sunday morning they again went to the Cummings home.

None of the foregoing matters is in dispute. Although Lewis was brought from Des Moines and entertained, all at company expense, for the purpose of discussing his future with the Minnesota Mutual and the advisability of his accepting one of the other positions offered him, witnesses for defendants testified there was little discussion of these matters. Despite his frantic efforts to bring Lewis to St. Paul for a thorough discussion of "your problem", Mr. Cummings did not remember much about the conversations. He testified the most vivid recollection he had of any conversation with Lewis is that while they were riding from his house to the airport Sunday, he said, "Hu, what is it in the world you are looking for?" It is sufficient to say the jury must necessarily have believed plaintiff's testimony detailing the various conversations.

I. In Division IV the majority opinion finds the evidence was insufficient to show the written subagent's contract was modified, that at most it was given some consideration but it was not definitely modified and the evidence is too indefinite. This finding would be correct if the evidence for defendants only were considered. But, viewed in the light most favorable to plaintiff, the record on this point amply supports the general verdict.

Before the trip to St. Paul plaintiff had worked under the written subagent's contract, as modified by the payment of Club credits. There is no indication he was dissatisfied with any of its numerous provisions, except that he wanted security for his future. His concern about the status of his renewals was merely incidental to that. The oral agreement which the jury found was thereafter made, would in effect change only the provision that the subagency "shall continue during the will of the parties hereto subject to termination by any party hereto at any time upon fifteen days" notice. It is true the parties did not discuss just what provisions of the contract would be modified by this

new agreement. But in the absence of specific agreement affecting them other provisions of the subagent's contract would remain unchanged. The situation here is analogous to that in Elwell v. State Mutual Life Assur. Co., 230 Mass. 248, 119 N. E. 794, in which an oral contract continued the subagent's former written agreement with one change. Later the subagent was discharged. He sued to recover renewals which accrued after his discharge. The contract was held noncancellable and the subagent was held entitled to the renewals.

Lewis testified that when Cummings first stated the proposition whether it would be better for Lewis to accept one of the other offers rather than a lifetime contract with the Minnesota Mutual, Lewis replied, "I want to make a decision at my age [forty-six] once and for all. I want to know what my future is going to be for my security." Cummings pointed out that a lifetime arrangement with Minnesota Mutual would afford security for Lewis' future because of the continuing nature of the organization and also because, after nine years his annual receipts from renewals would pyramid to an amount which would approximately equal his average annual commissions on new business.

At the meeting between Cummings, Carnahan and plaintiff at Cummings' home on Saturday evening, Cummings asked Lewis, "Hu, have you reached any definite decision about our conversation * * * as to a lifetime contract with the Minnesota Mutual Life Insurance Company?" Lewis replied he had, depending, of course, upon Cummings and upon Carnahan's decision. Cummings then summed up the situation and said, "I think he should stay with us and work with us during his lifetime. I think he should forget these other offers or turn them down * * *. What do you think?" Carnahan said, "Fine, he ought to lead the company in production." Cummings said, "Is that agreeable with you, Hu?" Lewis said, "It is, provided we are all agreed that it is a lifetime future and a lifetime association." Cummings said, "Fine. I am glad we are all agreed." Carnahan said, "I am glad that Hu has decided to make a lifetime contract to work." Carnahan said he was glad Hu had decided to work for them the rest of his life.

The majority opinion states: "\* \* \* plaintiff \* \* \* claims Lewis did testify that he promised to remain as a subagent for the remainder of his life. We doubt that the record shows any such express agreement. What seems to be considered by the plaintiff as such an agreement was a conversation which was casual, at best \* \* \*"; it was "in a general conversation" in which Carnahan "mentioned [the lifetime agreement] to Cummings in one part of the conversation."

This was the conference in St. Paul which Cummings had previously proposed. He had requested plaintiff, "Meantime, let's hold everything please." Plaintiff and Carnahan had been flown several hundred miles and feted and entertained at company expense, that Cummings might have "a chance to talk this thing out with you." This conference was part of the "thorough discussion" referred to in one of Cummings' letters. Yet the majority opinion, while stating the evidence should be considered in the light most favorable to plaintiff, overrules the finding of the jury and holds the discussion was "casual at best" and "general" and that Carnahan merely "mentioned to Cummings" the lifetime agreement in one part of it.

I do not believe a fair interpretation of the language of Lewis, Carnahan and Cummings, under the circumstances shown in the record, sustains the finding of the majority in Division IV that the evidence of modification is indefinite. On the contrary I believe it clear and explicit. It is ample to support a finding there was a specific and definite bilateral agreement between defendants and plaintiff, whereby defendants promised to retain plaintiff as their subagent for the remainder of his life, and plaintiff promised to refuse the other offers which had been made him, and to work for defendants as subagent for the remainder of his life.

The foregoing discussion and conclusion is applicable also to the finding in Division IV of the majority opinion "there is nothing in the claimed modified contract by which [appellant] was obligated to continue in employment for any length of time." This finding simply overlooks the evidence that plaintiff did promise to work for defendants "the rest of his life."

II.   No decision comparable factually to the case at bar has been called to my attention. Lewis' written contract had made

him subagent in a territory, which was not exclusive, and was limited to the General Agents territory. The contract fixed his commissions based upon first-year premiums of policies procured by him. It provided also for renewal commissions in any year in which the agent earned first-year commissions of $500 but stated the right of the subagent to renewal commissions would continue as long as he actively represented the company and produced at least twelve new applications each year.

Within a short time Lewis became the leading salesman for Minnesota Mutual, was being photographed for the company magazine, heaped with encomiums, pointed to as a model for ordinary agents, and paid additional compensation called Club credits by Vice-president Cummings' agencies department. Then Mr. Cummings received the disquieting letter advising him Lewis was considering accepting other offers of employment. Mr. Cummings acted quickly. He promptly consulted one of the superintendents of agencies, who tried to telephone Lewis. Then Cummings wrote Lewis asking him to delay his decision, suggesting Lewis come to St. Paul at company expense to discuss the matter, inviting him to go on a fishing trip, requesting him to telephone and later arranging for the three-day trip to St. Paul.

At the first opportunity Mr. Cummings broached the subject of the Minnesota Mutual and Lewis' other offers. He offered Lewis a lifetime contract. They discussed the other offers and considered certain features of them which might prove disadvantageous to Lewis. Cummings then pointed out the advantages of a lifetime agreement with Minnesota Mutual. '

Although Cummings assumed the attitude of a disinterested friend assisting Lewis in solving "your problem" it is evident his primary purpose was to advance the interests of the Minnesota Mutual. Apparently Lewis indicated the suggested lifetime contract would be acceptable to him. Here then was Cummings' opportunity to retain the services of the star salesman upon terms advantageous to the company. It was not chancing a long-time deal with a stranger. Lewis had been with the company for such time that they were familiar with him and his methods of operation. He would receive no salary. He would not be entitled to commissions upon insurance sold by

anyone other than himself. He would have charge of no office or agents. He would have no exclusive territory. Every dollar paid him would be for value currently received by the Minnesota Mutual. Life insurance companies generally are not troubled with overproduction, shortage of territory or overcrowding of territory by soliciting agents. They want as much volume as possible. They also want every good salesman to continue with them all his life. It may be inferred this is largely the reason for the collection charge on renewals after the subagent leaves the Minnesota Mutual. Nor was Mr. Cummings plagued with the question which has frequently troubled courts, that of the continued existence of the employer in the business in question throughout the lifetime of the employee. As he pointed out "an insurance company goes on and on even after individuals replace themselves."

Of course, the proposed agreement was one which the Minnesota Mutual might lose unless it was closed promptly before Lewis returned to Des Moines. There was evidence it was presented to Carnahan at Cummings' home on Saturday evening and was then and there agreed to by Carnahan, Cummings and Lewis. Lewis and Carnahan returned to Des Moines the next day. Lewis rejected his other offers. He continued his extraordinary sales record with the Minnesota Mutual until February 17, 1947. Then without advance notice Carnahan telephoned Lewis his contract was terminated. No reason for the termination was given. Lewis telephoned Cummings who promised to review the matter and call Lewis but did not call him.

The record does not support the statement in the majority opinion that plaintiff "was guilty of conduct which would promote trouble in the agency." Had this been true it is fair to infer defendants would have attempted to prove it. However, they have never contended they terminated the contract because Lewis violated its terms. Nor is it contended any explanation for its termination was ever given Lewis. Defendants neither pleaded nor offered any evidence tending to prove plaintiff "was guilty of conduct which would promote trouble in the agency." They took the position they had the right to terminate the contract at their option as provided by the original subagent's contract. Even under defendants' theory plaintiff was

entitled to fifteen days' notice of the termination of the contract and hence was clearly entitled to some damages. Massachusetts Bonding & Ins. Co. v. Johnston & Harder, 348 Pa. 512, 35 A. 2d 721.

III.   As a general rule the term "permanent employment" as used in contracts of employment means steady employment as contrasted with temporary employment. Hence various contracts for permanent employment and even for life employment have been held no more than indefinite general hirings or hirings at will. "In other words, where the intent to enter into a contract for permanent employment, not terminable except pursuant to its express terms, is not clearly expressed, and there is no evidence showing consideration other than a promise to render service, the assumption will be that, even though the parties speak in terms of permanent employment, the parties have in mind merely the ordinary business contract for a continuing employment, terminable at the will of either party." 56 C. J. S., Master and Servant, section 8c, page 78.

The part of the rule above quoted is accepted in principle by most courts but there is much disagreement as to its application.   One point of disagreement is referred to as follows in Littell v. Evening Star Newspaper Co., 73 App. D. C. 409, 120 F. 2d 36, 37:

"The rule is that unless the parties reveal an intent to enter into a contract for permanent employment, it will be regarded as terminable. Where the intent is not clearly revealed by the express terms of the agreement, the courts will look to evidence of surrounding circumstances to determine what was in the minds of the contracting parties. Thus, when one who enters into a contract of employment, promises not only that he will give his services but also additional consideration—as, for example, * * * giving up his own business * * *—such facts may be sufficient, in each case, to show the intent of the parties to enter into a contract for permanent employment.

"Some of the courts have reasoned from these cases that, to prove a contract of permanent employment, *two* considerations *must* be shown; that is, a consideration in addition to the services to be performed; and that in the absence of two con-

siderations there can be no such contract. This misconception results from mistaking the form for the substance. If it is their purpose, the parties may enter into a contract for permanent employment—not terminable except pursuant to its express terms—by stating clearly their intention to do so, even though no other consideration than services to be performed is expected by the employer or promised by the employee. The meaning of the cases previously referred to is that where no such intent is clearly expressed and, absent evidence which shows other consideration than a promise to render services, the assumption will be that—even though they speak in terms of 'permanent' employment—the parties have in mind merely the ordinary business contract for a continuing employment, terminable at the will of either party."

The rule announced in the Littell case was followed in Eggers v. Armour & Co. of Delaware, 8 Cir., Iowa, 129 F. 2d 729, 731, in which the court said:

"The applicable law is that of Iowa. Apparently no similar situation has been considered by the Iowa courts. There is no ground for believing that the law of Iowa governing this case differs from the law generally applicable.

"We have no doubt that the defendant could obligate itself to furnish the plaintiff for life with such work as he would be capable of performing in his disabled condition and to pay him wages so long as he was able to render service, and that his promise to remain in defendant's employ and render the required service would be a sufficient consideration to support the obligation. The rule is that a contract for lifetime employment will be given effect, according to its terms, if the intention of the parties to make such an agreement is clear, even though the only consideration for it, so far as the employer is concerned, is the promise of the employee to render the service called for by the contract. Littell v. Evening Star Newspaper Co., 73 App. D. C. 409, 120 F. 2d 36, 37. See, also, Arentz v. Morse Dry Dock & Repair Co., 249 N. Y. 439, 164 N. E. 342, 344, 62 A. L. R. 231, 234; Roxana Petroleum Co. v. Rice, 109 Okl. 161, 235 P. 502, 506; 35 Am. Jur. 460, §24.

"Where the words 'permanent employment' are used in a contract of hiring and it is not clear from the language of the contract, or from the circumstances surrounding the making of it, or from the consideration furnished, that the parties intended that the employment was to continue for life or while the employee could render the required service or the employer furnish the employment, the contract will be construed to be for an indefinite period and terminable at will by either party. Faulkner v. Des Moines Drug Co., 117 Iowa 120, 90 N. W. 585; Rape v. Mobile & Ohio R. Co., 136 Miss. 38, 100 So. 585, 35 A. L. R. 1422, annotations page 1432; Arentz v. Morse Dry Dock & Repair Co., supra, 249 N. Y. 439, 164 N. E. 342, 62 A. L. R. 231, annotation page 234; Littell v. Evening Star Newspaper Co., supra, 73 App. D. C. 409, 120 F. 2d 36, 37. The contract, which the plaintiff testified that he entered into with the defendant, by its terms provided that the employment was to be for the term of plaintiff's life, provided he continued to render the service contemplated. If the contract existed, it was clearly not terminable at will."

This decision was in turn followed in Abbott v. Arkansas Utilities Co., 8 Cir., Ark., 165 F. 2d 339, 340, which states:

"In Eggers v. Armour & Co., supra, this court held that the situation there involved had never been considered by the Iowa appellate court and hence, there was no applicable law of Iowa, and it was held that a contract for lifetime employment 'will be given effect, according to its terms, if the intention of the parties to make such an agreement is clear, even though the only consideration for it, so far as the employer is concerned, is the promise of the employee to render the service called for by the contract.' * * *

"The contract here pleaded, which is admitted by the motion, is a specific, definite bilateral contract as distinguished from a unilateral contract. Such a contract has been referred to as one in which there are reciprocal promises so that there is something on both sides to be done or forborne. It is 'a promise for a promise'; that is, one in which there are mutual promises between two parties to the contract. 17 C. J. S., Contracts, §8. The term 'unilateral contract' has been criticized as

a misnomer and it has been applied to various situations, the term being frequently employed to express absence of mutuality, but for our purpose here it may be defined as a contract in which a promisor receives something more than a promise as compensation for his promise. * * *

"In a bilateral contract mutual obligations are requisite and the promise which one makes is a sufficient consideration for the promise which the other makes."

The rule announced by the foregoing decision is applicable to the bilateral contract shown here by the record. I am satisfied it is sound. The majority opinion would depart from the established rule of a promise for a promise and would require that two considerations be shown.

As pointed out by the Court of Appeals for this Circuit in the Eggers case and again in the Abbott case, there are no Iowa decisions from other jurisdictions applicable to this situation. Various decisions from other jurisdictions are cited in the footnotes in 56 C. J. S., Master and Servant, section 8c, page 78, and in annotations in 35 A. L. R. 1432 and 135 A. L. R. 646.

Elwell v. State Mutual Life Assur. Co., supra, 230 Mass. 248, 251, 119 N. E. 794, 795, is in many respects parallel to the case at bar. There the subagent made an oral agreement extending, with one change, his written contract with the general agent. He was discharged and sued the company and Williams, the general agent, to recover renewals. In allowing a recovery the court pointed out that the oral contract was to be deemed and treated as the same in terms and effect as though the written contract had been redrafted with the change. On the issue of consideration the court stated: "It is supported by a sufficient consideration, namely, services to be rendered by the plaintiff, and it was not terminable at the will of the defendant Williams or by the company * * *."

Defendants contend the subagent's contract in the Elwell case was different than in the case at bar. I am unable to find any such difference as would make the Elwell case here inapplicable.

IV. But had two considerations been necessary, it happens they were present in this case. There is evidence Lewis promised to "turn down" the other offers made him. This was a definite consideration for defendants' promises.

In Division V the majority opinion holds: "The giving up of the opportunity to take other employment cannot be held to be an additional consideration". I believe that is contrary to a basic rule of contracts, to wit: that a forbearance or detriment or a promise of forbearance is consideration.

. Some of the decisions cited in Division V of the majority opinion turn upon the finding that any detriment sustained by plaintiff in preparing himself to accept the offered employment was not mutually understood as being part of the consideration. Those cases are not in point because here there was evidence the promise to "turn down" the other offer was mutually understood as being part of the consideration. Although there are some decisions supporting the pronouncement of the majority, the contrary rule, which I think is sound, finds support in the following:

Fletcher v. Agar Mfg. Corp., D. C. Mo., 45 F. Supp. 650; Riefkin v. Du Pont de Nemours & Co., 53 App. D. C. 311, 290 F. 286; Carnig v. Carr, 167 Mass. 544, 46 N. E. 117, 35 L. R. A. 512, 57 Am. St. Rep. 488; Lucacher v. Kerson, 158 Pa. Super. 437, 45 A. 2d 245, 248, affirmed 355 Pa. 79, 48 A. 2d 857; Millsap v. National Funding Corp., 57 Cal. App. 2d 772, 135 P. 2d 407, 409; Weber v. Perry, 201 S. C. 8, 21 S. E. 2d 193, 195. See also 56 C. J. S., Master and Servant, section 8c, pages 78, 79.

Defendants would distinguish the cases above cited on the ground that there the party gave up his own business or an existing employment while here plaintiff merely agreed to (and did) "turn down" the other offers. This argument is basically unsound. A promise to relinquish an offered position constitutes consideration as valid and sufficient as a promise to relinquish an occupied position.

. V. Defendants contend plaintiff was an independent contractor. The written agreement repeatedly refers to the agency relationship and I believe the term insurance agent correctly defines plaintiff's status. See 44 C. J. S., Insurance, section 136

et seq.; 29 Am. Jur., Insurance, section 85 et seq.; section 515.125, Code of Iowa, 1946. However, his title is not material. There may be a contract for life with an employee, an agent or an independent contractor. Walker v. John Hancock Mutual Life Ins. Co., 80 N. J. L. 342, 344, 79 A. 354, 355, 35 L. R. A., N. S., 153, Ann. Cas. 1912A 526, states with reference to the discharge of a soliciting insurance agent:

"As between the principal and agent the right [to terminate the relation] depends on the terms of the contract; and if the agent is discharged in violation of those terms, he has a right of action for the wrongful discharge. In this respect the contract and the rights thereunder are analogous to the ordinary contract between master and servant."

Defendants argue also plaintiff "had the absolute right to determine just how much or how little time he would devote to his work." Fairly interpreted, plaintiff's promise to work for defendants during his lifetime means continuing to give all his time and efforts to their service, as their agent, exclusively, in conformity with their rules and regulations, as he had been doing and as he proceeded to do until he was discharged. 44 C. J. S., Insurance, section 155, page 829, states:

"Where the agent agrees to devote his entire time and energy to the company's business, he is bound to devote his time and energy with that degree of diligence and attention usual among industrious business men engaged in like business and pursuing no other avocation."

I do not agree with defendants' contention that Lewis' promise to work for defendants did not bind him and thus furnish sufficient consideration for defendant's promise. However, the record shows he furnished other sufficient consideration in promising to reject the other offers of employment. 17 C. J. S., Contracts, section 74. He fully performed this promise. As stated in 17 C. J. S., Contracts, section 100, page 447:

"Where there are mutual promises between the parties, it is not necessary to render a particular promise by one party binding that there be a special promise on the part of the other

party directed to that particular obligation, as mutuality may be supplied to a subsidiary promise by the consideration of the principal contract."

17 C. J. S., Contracts, section 100, page 452, states:

"Where an independent consideration passes from the employee in addition to the performance of services, the duration of the contract may be optional on his part without impairing its mutuality. This rule is applicable in the case of contracts whereby in consideration of the release of a claim of damages the employer promises the employee employment, but the employee does not agree to serve."

In Kirkley v. Roberts Co., 268 Mass. 246, 251, 167 N. E. 289, 290, plaintiff was promised a written contract if he would leave his then employer and go with the company—

"He decided so to do, and received this written agreement. Here was sufficient consideration for the promise of employment. * * * The duration of the employment is stated to be 'as long as he shall faithfully and diligently perform the duties of his employment.' There is no promise on the commission agent's part to remain with the company for any definite time. This does not invalidate the contract, nor, of itself, make it terminable at the will of the company. Whatever may be the law elsewhere, it is settled by the decisions already cited * * * that here a contract in the terms of the one before us is binding upon the company so long as the agent faithfully and diligently performs and is willing and able to perform the prescribed duties at the compensation fixed."

This principle was recognized in Wright v. Iowa Southern Util. Co., 230 Iowa 838, 842, 298 N. W. 790, 793: "Where there is more than one consideration for a contract, the insufficiency of one will not invalidate the contract, but the remaining consideration will support it. 12 Am. Jur. 612, section 118; Restatement of Contracts, Volume 1, section 84, clause (b)."

In Hichhorn, Mack & Co. v. Bradley, 117 Iowa 130, 90 N. W. 592, plaintiff had given defendant an exclusive agency in Iowa for the sale of a certain brand of cigars. Defendant

had agreed to render his best services in pushing such sales but did not agree to devote his entire time thereto. The contract was held enforceable and defendant allowed to recover on counterclaim for loss of future profits. In Kaufman Bros. & Co. v. Farley Mfg. Co., 78 Iowa 679, 685, 43 N. W. 612, 614, 16 Am.. St. Rep. 462, plaintiff agreed to give defendant an exclusive agency for the sale of cigars "as long as he pushed them." On the point of want of mutuality it was urged there was no agreement on defendant's part to work up the trade or put men into the field, but the court said:

"The evidence does not, in terms, state such an agreement, but it does show that defendant bought cigars for sale in that territory, and that defendant was to have the goods for sale as long as it 'pushed them.' This is surely evidence of the fact of such an agreement. Whether sufficient or not was a question for the jury * * *."

In Huntington v. Haish Co., 190 Iowa 1197, 1208, 181 N. W. 480, 484, plaintiff was a salesman on commission. The term of the contract was three years. Plaintiff agreed "to 'use his best efforts' to promote the sale" of defendant's engines. The contract was terminated before the three years had expired and plaintiff recovered for loss of future profits thereunder.

. Atlas Brewing Co. v. Huffman, 217 Iowa 1217, 1221, 1224, 252 N. W. 133, 135, 136, affirmed an allowance of damages for termination of an oral contract creating an agency for the sale of beer, to continue "as long as there would be a demand for the product, and as long as appellee desired to continue with the sale of the same." The decision refers to the Kaufman case, supra, as involving a similar situation and states:

"There the contract with the agent was for the sale of cigars in certain territory. The agent employed men to cover the territory and build up the trade for the cigars, and the principal was to ship the cigars when ordered, 'for as long as the defendant desired to deal in the cigar, or so long as the trade continued.' The contract continued for about three months, when the principal breached the same, refusing to furnish further cigars to the defendant. Verdict was directed against the

agent in a suit to recover damages for the reason that the contract lacked mutuality, and was too indefinite. This court reversed the lower court and held that the contract did not lack mutuality, and that it was definite enough to be enforced."

VI. Defendants contend the proof of damages was insufficient because too uncertain. In that connection it may be observed this appeal does not involve the amount of the verdict. Upon the motion for judgment notwithstanding verdict the question was whether plaintiff was entitled to a verdict in any amount. Had that motion been overruled before or after this appeal, the motion for new trial would then have been before the trial court for consideration and the court would then have determined whether the verdict was excessive, together with other grounds of the motion for new trial.

The jury was instructed the amount of recovery, if any, would be the present worth of plaintiff's diminished earnings, resulting from the termination of the contract. Williston on Contracts, Revised Ed., section 1346, page 3781, states: "Where a breach of contract involves deprivation of a chance which has value in a business sense, a just reluctance will be felt by most courts to deny altogether the recovery of substantial damages."

Hichhorn, Mack & Co. v. Bradley, 117 Iowa 130, 143, 90 N. W. 592, 596, holds the loss of prospective profits is a proper measure of damages for termination of a contract to sell cigars and states: "We think that it would be manifestly unjust to deny to the defendant in this case any recovery whatever for breach of his contract because the contract itself contemplated and was based upon prospective profits."

In Pierce v. Tennessee Coal, Iron & Railroad Co., 173 U. S. 1, 19 S. Ct. 335, 43 L. Ed. 591, which involved a contract of life employment the court stated the difficulty and uncertainty of estimating future damages was no greater than in a personal injury case. See also Klingman & Scoular v. Racine-Sattley Co., 149 Iowa 634, 639, 640, 128 N. W. 1109; Atlas Brewing Co. v. Huffman, 217 Iowa 1217, 252 N. W. 133; Huntington v. Haish Co., 190 Iowa 1197, 181 N. W. 480.

Moreover, the record shows without dispute that plaintiff was damaged $511.20 for renewal commissions withheld to the date of the trial and $2882.61, the agreed present value of renewal commissions to be withheld in the future. The majority opinion states these amounts were not allowable because "the instructions specifically limited the plaintiff's damages to loss of future profits and did not include renewal commissions or retained collection fees as an element of damages." This conclusion is erroneous. It is clear the $2882.61 represents future profits or earnings which plaintiff would have received. The error of the majority is in treating this as an *item* of damages, whereas it was merely an *element* of future profits.

VII. Division VII of the majority opinion finds the trial court should have sustained defendants' motion for judgment notwithstanding the verdict on the ground Cummings was not authorized by the Minnesota Mutual to enter into the contract claimed by appellant. The record shows this ground of the motion was made on behalf of the defendant Minnesota Mutual only and was based upon a ground of the motion for directed verdict which was specifically limited to Minnesota Mutual. I do not think Carnahan could predicate error on the refusal of the trial court to sustain this ground of the motion for judgment notwithstanding the verdict. Defendants contend he may do so because of one of the instructions to the jury. They cite only Western Fruit & Candy Co. v. McFarland, 188 Iowa 204, 217, 174 N. W. 57, which does not appear to sustain their contention. The trial court denied generally this ground of the motion for judgment notwithstanding verdict. I believe this was correct.

Ney v. Eastern Iowa Telephone Co., 162 Iowa 525, 541, 144 N. W. 383, 389, discussed in the majority opinion, involved the hiring by the president of an attorney, in an internal corporation dispute. The president's duties had been limited to presiding at directors' meetings. The court stated:

"It is apparent, then, that the president, by virtue of his office, alone, has no power to bind the corporation by any contract unless the articles of incorporation or the by-laws authorize him to do so. * * * There are cases in which the ordinary business of a corporation is conducted by its president * * * and in

these cases it is held that the natural inference is that he, as its president, has been endowed with the power to direct its operation and manage the transactions for which it was organized."

Evidently the able trial court was familiar with the doctrine of this and other Iowa decisions. The jury was told:

"In this case you are instructed that Mr. Cummings had no inherent authority to enter into the oral lifetime contract, if any, with the plaintiff Lewis merely by reason of and by virtue of his office of vice-president in charge of the agency department. * * * plaintiff must show * * * Cummings, as vice-president, did in fact have authority to make such oral lifetime contract * * *.

"In determining whether or not the said Cummings had authority * * * you may consider his official position with the company, the articles of incorporation and by-laws of the company, the manner and method in which he has been permitted to transact business for the company in dealing with agents and subagents, the character of the alleged contract as to whether it was one that would likely have been left to Cummings alone to make on behalf of the company, or otherwise, and all other facts and circumstances as shown by the evidence from which his authority to so act, or his lack of authority to so act may be shown or inferred."

Upon this question, of course, the record must be considered in the light most favorable to plaintiff. In Division II of this dissent I pointed out that the contract appeared to be very advantageous to the Minnesota Mutual for that it prevented the loss of a star insurance salesman and for various other reasons, whereas, it promised in return only the continuing opportunity for plaintiff to earn standard commissions for selling the thing the company was organized to sell and of which it had practically an unlimited supply. There was no agreement for a salary, specific territory, management or control over others, or payment of commissions earned by others.

Cummings had brought plaintiff and Carnahan to St. Paul and entertained them freely at company expense because of his anxiety to retain plaintiff's services. He was faced with the

alternative of failure unless he made a new agreement with plaintiff before the latter returned to Des Moines. Cummings was the vice-president and chief executive officer of the corporation with reference to agency matters and was the highest authority in such matters. He was also a member of the board of trustees and of the agency committee of three which had general supervision of agency matters. He had complete charge. of agency matters. As he told Lewis he was responsible for the men in the field. (At the time of trial he was president.)

Baltimore & O. R. Co. v. Foar, 7 Cir., Ind., 84 F. 2d 67, 71, 72, in affirming a judgment for damages for termination of an oral lifetime contract states:

"* * * it is worthy of note that the defense is usually the same, that is to say, that the contract was entered into without authority from the board, and without their knowledge or ratification. * * * With respect to appellant's knowledge of and acquiescence in the contract sued upon, we think it fair to assume that those in authority at Garrett performed their duties with reference to reporting to their superiors both at Garrett and at Baltimore."

Neither Cummings nor any other witness testified the contract with plaintiff was not authorized or ratified by the Agency Committee or Board of Trustees. The only evidence offered consisted of certain of the Articles of Incorporation and By-laws which contained general provisions for a Board of Trustees and Agency Committee, and minutes of meetings of the Board and Committee held in the year 1942.

It is worthy of note that in the one instance shown in the record in which the by-laws were applicable it does not appear any attention was paid their strict letter. I refer to the expenses of the trip to St. Paul of Lewis and Carnahan. The by-laws require that expenditures of less than $500 be authorized at a meeting of at least two members of the Agency Committee. It does not appear Cummings secured such authority. According to his letter he merely talked to a subordinate officer of the company before arranging the trip at company expense. The record does not indicate the Agency Committee concerned itself with anything other than matters of general policy. Under all

the 'circumstances I believe it was for the jury to say whether Cummings was authorized to make some concessions to retain the services of an outstanding agent.

Baltimore & O. R. Co. v. Foar, supra, 7 Cir., Ind., 84 F. 2d 67, 70, 71, states:

"The consensus of judicial opinion throughout the United States is that a corporation by its proper officers may lawfully enter into a life contract with an employee. * * * It is said, however, that the contract at bar is an unusual one in that it purported to run during the life of appellee, and that it should not be upheld unless express authorization or approval by the board is shown. Such contracts were properly characterized in the earlier decisions as unusual. However, from the number disclosed in the more recent cases, we are impressed with the fact that they are not now as unusual as they were."

In Eggers v. Armour & Co., supra, 8 Cir., Iowa, 129 F. 2d 729, the employee was injured at the Mason City, Iowa, plant and the case was tried under Iowa law. The court said, at pages 731, 732:

"The trial court was of the opinion that the alleged contract was of such an unusual nature that, in order to make a prima facie case, the plaintiff was required to show that the contract was executed by officers of the defendant pursuant to express authority conferred upon them by the defendant's Board of Directors. It seems to us that the trial court placed too great a burden upon the plaintiff.

"It is true that there was no evidence that McCann, as the employment manager at the Mason City plant of the defendant, had express authority to obligate the defendant to employ the plaintiff for life. There was evidence that he did not have such authority. The rule is that a general manager of a business with authority to employ is not presumed to have authority to make contracts for lifetime employment. [Citing authorities.] This rule, however, is not applied to cases where the contract for life employment is made in consideration of a settlement of a claim for damages for personal injuries. [Citing authorities.] * * *

"It seems to us, however, that there is no great distinction between the case of an employee who is given a life employment contract in settlement of his claim for injuries, and the case of an employee like the plaintiff, whose contract for life employment was not made in connection with the settlement of such a claim but was made because he, after many years of service for his employer, had suffered a disability, in the line of duty, which incapacitated him from performing his former duties but left him able to perform light work which the employer could furnish. In the former case the employer, by making the contract, satisfies a legal claim for damages, while in the latter case he satisfies a moral claim to afford a means of livelihood to an employee incapacitated in the service of the employer after many years of employment. If, in the former case, an employee might reasonably rely upon the apparent authority of the local agents or officers of such a corporate employer as Armour and Company to offer him a life contract of employment, we think that in the latter case an employee like the plaintiff could, with equal reasonableness, rely upon the apparent authority of such local agents and officers."

I would order the judgment reinstated and the case remanded for consideration and ruling upon defendants' motion for new trial.

BLISS, GARFIELD and MULRONEY, JJ., join in this dissent.